OPINION
{¶ 1} Messiah Carr-Poindexter ("Carr-Poindexter") was found guilty by a jury in the Montgomery County Court of Common Pleas of one count of aggravated robbery, in violation of R.C. 2911.01(A)(1), with a gun specification. He was sentenced to seven years of incarceration for the robbery and to three years for the gun specification, to be served consecutively. Carr-Poindexter appeals from his conviction.
 {¶ 2} The state's evidence revealed the following facts.
 {¶ 3} During the afternoon of June 12, 2003, Carr-Poindexter visited his father, James Carr, Sr. ("Carr"), at his father's residence, which was located at 443 Leland Avenue, in Dayton, Ohio. During this visit, Carr-Poindexter was agitated, hostile, and acted controlling. Carr-Poindexter left after a couple of hours.
 {¶ 4} Later that evening, Carr-Poindexter returned to 443 Leland Avenue. According to Carr, his son "burst through the door" carrying a .45 caliber firearm in one hand and cradling an AK-47 in his other arm. Carr testified that Carr-Poindexter's wife, Stacey Carr-Poindexter ("Stacey"), was also there and that she was armed with a .380 pistol. Carr-Poindexter pointed his weapons at Carr and kept saying that he (Carr-Poindexter) "was a dog," meaning that he was uncontrollable. Carr-Poindexter then ordered his father onto his front porch. Carr-Poindexter and Stacey left the house ten to twenty minutes later through the back door. Carr-Poindexter walked out the back door and up the alley which runs alongside Carr's house while his wife allegedly drove her car, an Oldsmobile Cutlass, along the alley. Carr-Poindexter went onto the porch and knocked his father down. He hit and kicked his father, again stating "I'm a dog." After Carr-Poindexter and Stacey had left, Carr discovered that his cellular telephone, a diamond ring, and $300 were missing. The number to his cell phone was 718-4479.
 {¶ 5} At approximately 8:15 p.m., the Dayton police received an anonymous call from a payphone four blocks from Carr's house. The caller indicated that a man living at 443 Leland Avenue was having trouble with his son. Officer William Gross arrived at Carr's residence at approximately 9:40 p.m. Carr told the officer what had occurred and informed him that Carr-Poindexter and Stacey could be found at 211 E. Siebenthaler Avenue, Apartment D. Gross, along with Officer Chris Smith and several other officers, went to the Siebenthaler address, which was Stacey's apartment. Stacey answered the door and stepped outside. She was cooperative and was ultimately taken into custody. The officers searched her apartment for Carr-Poindexter without success.
 {¶ 6} While Smith was inside Stacey's apartment, the telephone rang. The caller ID indicated that the call was from 718-4479. Smith noted the number and answered the telephone. The caller asked who he was. Smith gave the caller his name. The caller responded, "What are you doing in my house with my wife?" Smith informed the caller that he was investigating a complaint from Carr. After again asking Smith who he was, the caller stated "that this was a family matter and that the police did not need to get involved in this."
 {¶ 7} A few days later, Carr-Poindexter was stopped by two officers, Daniel Reynolds and Mike Auricchio, who were on a routine bike patrol. Upon his arrest, the officers discovered a black .45 caliber handgun in his pocket. Carr-Poindexter had also told Reynolds to "watch out" because "my dude's inside with an "A-K."
 {¶ 8} Carr-Poindexter and Stacey were indicted on one count of aggravated robbery and one count of aggravated burglary, each with a gun specification. They were tried by a jury on September 2 and 3, 2003. During the trial, Carr-Poindexter presented the testimony of Joanne Durham, who lived across the street from Carr. She testified that Carr had had a gun during the afternoon and that Carr-Poindexter had tried to take that gun away. She further testified Carr-Poindexter had later returned in a car, had gone onto Carr's porch and had hit Carr. Stacey presented evidence that she had been ill on June 12th and had remained at her sister's home at 729 Lexington throughout the day. Witnesses testified that she only left the house to go to the Huber Health Center, located at 8701 Old Troy Pike in Huber Heights, arriving there at approximately 8:50 p.m. The jury acquitted Stacey of both charges, and Carr-Poindexter was acquitted of aggravated burglary. The jury convicted Carr-Poindexter of aggravated robbery.
 {¶ 9} Carr-Poindexter raises four assignments of error on appeal.
 {¶ 10} "I. Appellant was deprived of effective assistance of counsel."
 {¶ 11} In his first assignment of error, Carr-Poindexter claims that his trial counsel provided ineffective assistance. In order to demonstrate ineffective assistance of counsel, Carr-Poindexter must establish that his counsel's representation fell below an objective standard of reasonableness and that he has been prejudiced by his counsel's deficient performance. Strickland v. Washington (1984),466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674; State v. Bradley (1989),42 Ohio St. 3d 136, 538 N.E.2d 373. Trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. See Strickland, 466 U.S. at 689. Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel. See id.; State v. Parker, Montgomery App. No. 19486, 2003-Ohio-4326, ¶ 13.
 {¶ 12} Carr-Poindexter claims that his trial counsel was ineffective in three respects.
 {¶ 13} First, Carr-Poindexter asserts that his trial counsel was ineffective by failing to file a motion to suppress all evidence relating to the telephone call that was answered by Officer Smith. He asserts that the contents of the telephone call and the number displayed on the caller identification panel were obtained as a result of an illegal search. In particular, he contends that Smith's answering of the telephone call exceeded the bounds of a search incident to Stacey's arrest and of a protective sweep. He further argues that the telephone call and the number display did not meet the "plain view" exception.
 {¶ 14} As noted by the state, defense counsel apparently focused on the theory that Carr-Poindexter had resided at his father's home on Leland Avenue and not at the Siebenthaler apartment. Although not evidence, Carr-Poindexter's counsel stated in his opening statement that "Messiah was living at his father's house and his wife was living someplace else." Stacey's counsel also stated that Stacey's marriage to Carr-Poindexter "was on shaky grounds, they hadn't been livin' together. Stacey had her own place." We note that if Carr-Poindexter was not living with Stacey and had no expectation of privacy in her apartment, he would lack standing to challenge the search of her apartment and the answering of her telephone. See State v. Moore, Montgomery App. No. 20198, 2004-Ohio-3783, ¶ 10. In addition, because Carr-Poindexter apparently disputed the burglary charge on the ground that he was living at his father's home, defense counsel may have decided not to challenge the events at Stacey's apartment as a matter of trial strategy.
 {¶ 15} Furthermore, we cannot conclude, based on the record before us, that the evidence relating to the telephone call was gathered in violation of Carr-Poindexter's Fourth Amendment rights. We note that we are hampered by the dearth of evidence regarding the search. Despite defense counsels' opening statements, we find no evidence in the record as to whether Carr-Poindexter resided — to any extent — at the Siebenthaler apartment. As to the search itself, Officer Gross testified that Stacey answered the door to her apartment and stepped out onto the sidewalk in front of the building as requested by the officers. Officers Gross and Smith both indicated that Stacey was cooperative. At this time, the officers entered the apartment to look for Carr-Poindexter. Gross indicated that Stacey, accompanied by an officer, went into the living room during the search, and that she was not free to go. However, it is unclear whether Stacey was under arrest at this time. The record does not reflect whether the officers sought consent from Stacey to search her residence and whether Stacey voluntarily gave any consent. Presumably, the state would have elaborated on these details either during a suppression hearing or, if they were aware that the validity of the search would be contested, at trial.
 {¶ 16} Assuming that no consent had been given, police officers are entitled to conduct a protective sweep of a residence, limited to areas where an individual may be hiding, when they have a reasonable belief based on articulable facts that the area searched harbors an individual posing a threat to the officers or others. Maryland v. Buie (1990),494 U.S. 325, 327-328, 110 S.Ct. 1093, 108 L.Ed.2d 276; State v. Lyons
(1992), 83 Ohio App.3d 525, 615 N.E.2d 310. In this case, the officers had been told by Carr that Carr-Poindexter and his wife could be located at 211 E. Siebenthaler Avenue, Apartment D. When they arrived, they noticed the vehicle that Carr had identified and found Stacey at the apartment. Having been informed that Carr-Poindexter had been armed with a .45 caliber handgun and an AK-47, the officers were justified in searching for Carr-Poindexter in the apartment.
 {¶ 17} Once the officers are properly on the premises, they may seize evidence that is in plain view. Officer Smith testified that the display was "on the outer portion of the phone" where it could be seen. Carr-Poindexter asserts that the plain view doctrine does not apply, because the number displayed on the caller id was not obviously incriminating. (Officer Smith had testified that he had not been informed that a cell phone had been taken from Carr.) Because Smith was lawfully in Stacey's apartment and was entitled to conduct a protective sweep of the apartment to search of Carr-Poindexter, we have no difficulty with Smith's observing and noting the telephone number.
 {¶ 18} As to Smith's answering the telephone, the lawfulness of Smith's conduct depends upon the permissible scope of the search. In Cityof Lakewood v. Smith, 1 Ohio St.2d 128, 205 N.E.2d 358, three detectives went to the defendant's home based on an anonymous report that he was "booking" horse racing bets at his residence. The officers knocked on the door and were admitted by the defendant. Certain horse race betting supplies were observed by the officers. Shortly thereafter, the telephone rang, and it was answered by one of the detectives. The caller asked to speak with the defendant. After being told that he was not there, the caller tried to place a bet with the officer. The defendant was then asked to empty his pockets. When he declined, he was placed under arrest and searched. Upon review, the supreme court found that the officer trespassed when he answered the defendant's telephone and that the defendant's Fourth Amendment rights had been violated. It further noted, however, that "[t]he telephone call, if intercepted after entrance pursuant to a lawful search warrant, would have been admissible as a `verbal fact' going to prove the nature of the illegal business being conducted in the home."
 {¶ 19} As recognized by the Sixth Circuit Court of Appeals, several federal and state courts have concluded that "an agent's conduct in answering a telephone while lawfully on the premises is not violative of the Fourth Amendment." United States v. Passarella, (C.A.6 1986),788 F.2d 377, 380-81 (citing cases); see also United States v. Hill
(C.A.5 1994), 19 F.3d 984, 987 at n. 2 (answering telephone did not exceed search warrant); United States v. Stiver (C.A.3 1993), 9 F.3d 298
(same). The Passarella court found that the police had lawfully answered the defendant's telephone while on the premises due to an arrest warrant, stating:
 {¶ 20} "In our view, in the circumstances obtained here, it makes little difference whether the police are armed with a warrant to search the defendant's premises or whether the police are armed with a warrant to arrest the defendant. In both instances, the police are authorized to enter the defendant's premises in order to search for and seize that which is described in the warrant; and once lawfully present, the police may answer a ringing telephone." Id. at 381. The court suggested that answering a telephone while lawfully on the premises is not entitled to constitutional protection. See id. at n. 4.
 {¶ 21} Based on the record before us, we cannot conclude that Carr-Poindexter would have prevailed on a motion to suppress the telephone conversation. Officer Smith indicated that the telephone rang while he was still inside the apartment to search for Carr-Poindexter. It is clear that Stacey was not free to answer the telephone. Because there was no suppression hearing, there is no evidence as to whether Stacey had consented to the Smith's answering of her phone, whether Stacey was under arrest at that time, and the officer's reasons for answering the telephone. In other words, the record does not reflect whether our focus should be the protective sweep, Stacey's arrest, or consent. Accordingly, although Carr-Poindexter may have had an arguable basis for challenging the constitutionality of Smith's answering of Stacey's telephone, we cannot conclude on this record that his counsel was ineffective for failing to bring a motion to suppress.
 {¶ 22} Second, Carr-Poindexter argues that his trial counsel rendered ineffective assistance when he failed to object to the admission of the telephone conversation and the cell phone number on the ground that the state had failed to authenticate Carr-Poindexter's voice. He asserts that the state did not satisfy Evid.R. 901(B)(5), which provides that voices may be authenticated "by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker."
 {¶ 23} Although Evid.R. 901(B)(5) provides a means for authenticating voices, it is not the only means. Evid.R. 901(A) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Evid.R. 901(B) specifically states that it provides "[b]y way of illustration only, andnot by way of limitation, * * * examples of authentication or identification conforming with the requirements of this rule."
 {¶ 24} "Telephone conversations are admitted where the identity of the parties is `satisfactorily explained.'" State v. Williams (1979),64 Ohio App.2d 271, 274, 413 N.E.2d 1212. "Testimony as to a telephone call is admissible where there is a reasonable showing, through testimony or other evidence, that the witness placed or received a call as alleged, plus some indication of the identity of the person spoken to. `There is no fixed identification requirement for all calls.' * * * `Each case has its own set of facts.'" State v. Vrona (1988),47 Ohio App.3d 145, 149, 547 N.E.2d 1189 (citations omitted). "Circumstantial evidence, as well as direct, may be used to show authenticity. Williams, supra, 64 Ohio App.2d 274. Moreover, the threshold standard for authenticating evidence pursuant to Evid.R. 901(A) is low, and `does not require conclusive proof of authenticity, but only sufficient foundational evidence for the trier of fact to conclude that * * * [the evidence] is what its proponent claims it to be.' State v.Easter (1991), 75 Ohio App.3d 22, 25, 598 N.E.2d 845." State v.Young, Montgomery App. No. 18874, 2002-Ohio-1815.
 {¶ 25} In this case, we agree with the state that Carr-Poindexter's voice was authenticated by the content of his conversation with Smith and the surrounding circumstances. The telephone conversation at issue was placed from Carr's cellular telephone — the same telephone that Carr had testified that Carr-Poindexter had taken earlier that evening. Moreover, the caller had stated, "What are you doing in my house with my wife?" Carr-Poindexter was married to Stacey and had called her apartment. In addition, when told that Smith was investigating a complaint by Carr, the caller had responded that it was a "family matter." Based on these circumstances, there was sufficient foundational evidence that Carr-Poindexter placed the call to Stacey's apartment and spoke with Smith. Carr-Poindexter's counsel was not ineffective for failing to challenge the admissibility of this evidence.
 {¶ 26} Third, Carr-Poindexter claims that his counsel was ineffective by failing to object at trial to the introduction of Smith's testimony concerning the contents of the telephone call. Carr-Poindexter argues that the statement was hearsay and that the substance of the telephone call provided the only corroborating evidence that he had taken items from Carr and, thus, its admission was prejudicial. As stated supra, the state provided sufficient evidence to authenticate that Carr-Poindexter was the caller who spoke with Smith. Under Evid.R. 801(D)(2), a statement by a party-opponent is not hearsay. Accordingly, Smith's testimony regarding his telephone conversation with Carr-Poindexter was properly admitted. Again, Carr-Poindexter's trial counsel did not render ineffective assistance when he failed to challenge the introduction of this evidence.
 {¶ 27} The first assignment of error is overruled.
 {¶ 28} "II. The trial court erred in admitting into evidence hearsay evidence concerning a telephone number displayed on a caller identification panel."
 {¶ 29} In his second assignment of error, Carr-Poindexter claims that the trial court erred in admitting the telephone number displayed on the caller identification panel, because the number was hearsay and because Smith could not independently remember the telephone number.
 {¶ 30} Beginning with his hearsay argument, Carr-Poindexter asserts that the cellular telephone number was "a written statement made out of court and was offered as proof that Appellant stole Carr's cell phone." Carr-Poindexter asserts that the state presumably relied upon the business record exception to hearsay under Evid.R. 803(6). He argues that the state failed to properly authenticate the cell phone number as a business record and to prove that Carr owned the telephone.
 {¶ 31} In our judgment, the cellular telephone number is not hearsay, because it is not a "statement." To be a statement under Evid.R. 801(A), there must be an assertion by the declarant. As stated by State v. Duff
(Feb. 8, 2001), Franklin App. No. 00AP-562, the only Ohio court to address this issue:
 {¶ 32} "[C]aller ID information provided to a telephone user is based on computer-generated information and not simply repetition of prior recorded human output or observation, and thus does not fall within the scope of the hearsay rule. Culbreath v. State (Ala.App. 1995),667 So.2d 156; Tatum v. Commonwealth (1994), 17 Va.App. 585,440 S.E.2d 133; Watlington v. Commonwealth (Nov. 7, 2000), Va.App. No. 2332-99-3, unreported. Caller ID evidence, therefore, will not be inadmissible on hearsay grounds, but may be attacked based on a lack of foundation regarding the reliability of the device, or by otherwise demonstrating the unreliability of the information disclosed by it."
 {¶ 33} We find Duff to be persuasive. We likewise conclude that the cellular telephone number on the caller id was not hearsay.
 {¶ 34} Next, Carr-Poindexter asserts that Smith had no independent memory of Carr's cell phone number and, thus, the state should have been required to introduce his report into evidence in accordance with Evid.R. 803(5). Carr-Poindexter argues that, even after refreshing his recollection, Smith was still uncertain about what the number was displayed on the caller identification panel.
 {¶ 35} A witness's use of materials to refresh his recollection while testifying is governed by Evid.R. 612. The rule reads:
 {¶ 36} "Except as otherwise provided in criminal proceedings by Rules 16(B)(1)(g) and 16(C)(1)(d) of Ohio Rules of Criminal Procedure, if a witness uses a writing to refresh his memory for the purpose of testifying, either: (1) while testifying; or (2) before testifying, if the court in its discretion determines it is necessary in the interests of justice, an adverse party is entitled to have the writing produced at the hearing. He is also entitled to inspect it, to cross-examine the witness thereon, and to introduce in evidence those portions which relate to the testimony of the witness * * *."
 {¶ 37} "`In the `present recollection refreshed' situation, the witness looks at the memorandum to refresh his memory of the events, but then proceeds to testify upon the basis of his present independent knowledge.' `Prior to employing a writing to refresh the recollection of a witness, it must be established that the witness lacks a present recollection of the information or events described in the writing.'
 {¶ 38} "When a writing is used to refresh recollection, `[t]he writing itself is not offered as evidence. It merely serves as a memory jogging device, and compliance with the hearsay rule, the authentication rule or the so-called `best evidence rule' is not required.' `The writing used to refresh the witness's recollection is not admitted into evidence unless admission is requested by the adverse party, and in any event has no substantive evidentiary significance.' When using a statement under Evid.R. 612 to refresh recollection, `a party may not read the statement aloud, have the witness read it aloud, or otherwise place it before the jury.'" Barhorst v. Sonoco Products Co. (Sept. 12, 1997), Miami App. No. 96CA28 (citations omitted).
During Smith's testimony, he and the prosecutor had the following exchange:
 {¶ 39} "Q: Okay. And do you know what number it [the caller identification panel] showed, uh . . . as being the incoming — or the phone number from which the call was made?
 {¶ 40} "A: I — I documented that in my report.
 {¶ 41} "Q: You don't recall it?
 {¶ 42} "A: I know it was seven one eight but I can't recall the last four digits.
 {¶ 43} "Q: Would it refresh your recollection to review your report, uh . . .
 {¶ 44} "A: Yes, it would.
 {¶ 45} "Q: . . . with regard to that number? Okay. Now, what I want you to do, the way the rules work is, you take a look at your report and you see if that helps you remember and then you testify from your memory as to what that number was after you get a look at — get a look at it.
 {¶ 46} "A: I recollect at this point.
 {¶ 47} "Q: And it was?
 {¶ 48} "A: Seven one eight, four four seven nine, I believe. I may be wrong on the last four digits. Yeah, four four seven nine."
 {¶ 49} Upon reviewing the videotape of this exchange, Smith briefly reviewed his report and subsequently testified as to the telephone number from his memory. He then referred back to his report to quickly double-check the last four digits. No objection was made. Smith's testimony was properly admitted as a refreshed recollection.
 {¶ 50} The second assignment of error is overruled.
 {¶ 51} "III. The verdict was against the manifest weight of the evidence."
 {¶ 52} In his third assignment of error, Carr-Poindexter contends that his conviction was against the manifest weight of the evidence. He argues that Stacey's acquittal on both charges and his acquittal on the aggravated burglary count demonstrate that the jury found Carr's testimony to be largely incredible. He further asserts that the testimony of Carr's neighbor, Joanne Durham, contradicted Carr's testimony in many respects.
 {¶ 53} When a conviction is challenged on appeal as being against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Thompkins, 78 Ohio St.3d 380, 387,1997-Ohio-52, 678 N.E.2d 541, citing State v. Martin (1983),20 Ohio App.3d 172, 175, 485 N.E.2d 717. Because the trier of fact sees and hears the witnesses and is particularly competent to decide "whether, and to what extent, to credit the testimony of particular witnesses," we must afford substantial deference to its determinations of credibility. State v. Lawson (Aug. 22, 1997), Montgomery App. No. 16288. "Contrastingly, the decision as to which of several competing inferences, suggested by the evidence in the record, should be preferred, is a matter in which an appellate judge is at least equally qualified, by reason and experience, to venture an opinion." Id. A judgment should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. Martin,20 Ohio App.3d at 175.
 {¶ 54} The crux of Carr-Poindexter's argument is that it was unreasonable for the jury to have relied upon any portion of Carr's testimony. It is well-established that the jury need not accept or reject a witness's testimony in its entirety, and it is "not limited to accepting one person's account of what happened and rejecting all others." State v. Cunningham (July 25, 1991), Franklin App. No. 90AP-427. Rather, "[t]he trier of fact is free to assemble what it considers to be the truth from a selective array of all the testimony. The trier of fact has the latitude to accept or reject any and all parts of each witness's testimony." Id.; see also State v. Jackson, Franklin App. No. 02AP-867, 2003-Ohio-6183, ¶ 67; State v. Batin, Stark App. No. 2004-CA-128, 2005-Ohio-36, ¶ 25.
 {¶ 55} Upon review of the evidence, we cannot conclude that Carr-Poindexter's conviction was against the manifest weight of the evidence. Carr testified that his son had come to his home on two occasions on June 12, 2003. Carr testified that he did not have a weapon and that his son was hostile during his first visit. Although Durham testified that she had seen Carr with a long gun during Carr-Poindexter's first visit, she corroborated Carr's testimony that his son had visited twice.
 {¶ 56} Carr further testified that, when his son returned, he and Stacey burst through his front door, each with firearms. Carr indicated that his son had had a .45 caliber weapon and an AK-47. Carr further testified that Carr-Poindexter had left through the back door, had come up the alley along his house, had come up onto the porch and assaulted him without his weapon. Although Durham did not see Stacey at all on June 12th and the jury apparently believed that Stacey had not been involved in the robbery, Durham also testified that she had seen a car come up the alley later in the day, and that Carr-Poindexter had exited the vehicle, had gone on his father's porch and had attacked his father. The jury reasonably could have believed that Carr-Poindexter had returned to 443 Leland Avenue, had come up the alley and had beaten his father on his porch. The jury was free to disregard discrepancies in the details, such as that Carr had said that his son had walked up the alley, that Carr did not indicate that another man was on the porch when he was assaulted by his son, and that Durham had not heard shouting by Carr-Poindexter when he assaulted his father.
 {¶ 57} The jury could also have believed that Carr-Poindexter had burst through his father's front door, armed with two weapons. Durham had testified that she had just come out of her house to smoke when Carr came out of his house and sat down on the porch. She was still smoking the cigarette when Carr-Poindexter had come up the alley and onto the porch to attack his father. Because Carr had testified that his son had been in his home for approximately ten minutes before he was ordered onto the porch, a jury could have reasonably determined that Durham was inside her home when Carr-Poindexter arrived for the second time that day. Carr's testimony that his son was armed with a .45 caliber weapon and an AK-47 was supported by the testimony of Officer Daniel Reynolds, who arrested Carr-Poindexter on June 15, 2003. Reynolds testified that Carr-Poindexter had been armed with a .45 caliber handgun and that Carr-Poindexter had warned him that his "dude" had an AK-47. Finally, the jury could have believed Carr's testimony that Carr-Poindexter had stolen items from his home, including his cell phone, based on Smith's testimony that he had answered a telephone call at Stacey's apartment from the Carr's cellular telephone and the caller apparently had been Carr-Poindexter.
 {¶ 58} Accordingly, we cannot conclude that the jury clearly lost its way when it convicted Carr-Poindexter of aggravated robbery. This conclusion is not altered by the fact that Carr-Poindexter was acquitted of aggravated burglary. A person commits burglary if he, "by force, stealth, or deception * * * [t]respass[es] in an occupied structure * * * of any person when any person other than an accomplice of the offender is present or likely to be present, with purpose to commit in the habitation any criminal offense." R.C. 2911.11(A)(2). The jury could have reasonably believed that Carr-Poindexter had lived with his father, as his counsel had suggested, and thus he did not trespass in his father's house. Accordingly, the verdicts reached by the jury are not inconsistent.
 {¶ 59} The third assignment of error is overruled.
 {¶ 60} "IV. Prosecutorial misconduct deprived appellant of a fair trial."
 {¶ 61} In his fourth assignment of error, Carr-Poindexter claims that the prosecutor engaged in misconduct during his closing argument.
 {¶ 62} In analyzing claims of prosecutorial misconduct, the test is "whether remarks were improper and, if so, whether they prejudicially affected substantial rights of the accused." State v. Jones,90 Ohio St.3d 403, 420, 2000-Ohio-187, 749 N.E.2d 300, citing State v.Smith (1984), 14 Ohio St.3d 13, 14, 470 N.E.2d 883. "The touchstone of analysis `is the fairness of the trial, not the culpability of the prosecutor.'" Id., quoting Smith v. Phillips (1982), 455 U.S. 209, 219,102 S.Ct. 940, 947, 71 L.Ed.2d 78. Where it is clear beyond a reasonable doubt that a jury would have found the defendant guilty even absent the alleged misconduct, the defendant has not been prejudiced, and his conviction will not be reversed. See State v. Loza (1994),71 Ohio St.3d 61, 78, 1994-Ohio-409, 641 N.E.2d 1082. In reviewing allegations of prosecutorial misconduct, we review the alleged wrongful conduct in the context of the entire trial. Darden v. Wainwright (1986),477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144.
 {¶ 63} Generally, prosecutors are entitled to considerable latitude in opening statement and closing argument. State v. Ballew, 76 Ohio St.3d 244,255, 1996-Ohio-81, 667 N.E.2d 369; State v. Stevens, Montgomery App. No. 19572, 2003-Ohio-6249, ¶ 34. In closing argument, a prosecutor may comment freely on "what the evidence has shown and what reasonable inferences may be drawn therefrom." State v. Lott (1990),51 Ohio St.3d 160, 165, 555 N.E.2d 293, quoting State v. Stephens
(1970), 24 Ohio St.2d 76, 82, 263 N.E.2d 773. "Moreover, because isolated instances of prosecutorial misconduct are harmless, the closing argument must be viewed in its entirety to determine whether the defendant has been prejudiced." Stevens, supra, citing Ballew, supra, and State v.Lorraine (1993), 66 Ohio St.3d 414, 420, 613 N.E.2d 212.
 {¶ 64} Carr-Poindexter asserts that the prosecutor engaged in misconduct when he "prominently displayed the [.45 caliber] gun and waved it around in front of the jury during his closing argument." Carr-Poindexter claims that he had successfully objected to the introduction of the gun, that the prosecutor misled that jury into believing that the gun he displayed was the same gun found on Carr-Poindexter on June 15, 2003, and that he was prejudiced by the prosecutor's conduct.
 {¶ 65} The state responds that the trial court had overruled Carr-Poindexter's objection to allowing Reynolds to testify about the gun that he had found on Carr-Poindexter. Carr was later shown the weapon seized by Auricchio, and he identified it, without objection, as the .45 caliber weapon that his son had had. The state further argues:
 {¶ 66} "[T]here is absolutely no evidence that the assistant prosecutor displayed the gun to the jury, much less waved it around, during closing argument. Although the videotape of trial shows that the assistant prosecutor was out of the camera's view when speaking about the gun, it appears that he was writing or drawing on an easel. When the assistant prosectuor came back into view, he pointed in the direction of the easel when stating, `[Point] forty-five caliber. All he had in his hand at that time was a pad of paper.
 {¶ 67} "Indeed, the record reveals that the State did not even have the gun in its possession to display to the jury. In the State's case-in-chief, the assistant prosecutor returned the gun to Det. Auricchio's custody to place back in the property room. Consequently, the assistant prosecutor could not possibly have waved the gun around in front of the jury during closing argument." (citations to the record omitted).
 {¶ 68} The state's argument is borne out by the record. We find no evidence of prosecutorial misconduct as alleged.
 {¶ 69} The fourth assignment of error is overruled.
 {¶ 70} The judgment of the trial court will be affirmed.
Fain, J. and Grady, J., concur.