The STATE of Ohio, Appellee,

v.

SPRADLIN, Appellant.

[Cite as *State v. Spradlin*, 187 Ohio App.3d 767, 2010-Ohio-2140.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 23634.

Decided May 14, 2010.

768

Mathias H. Heck Jr., Montgomery County Prosecuting Attorney, and Michele D. Phipps, Assistant Prosecuting Attorney, for appellee.

Daniel J. O'Brien, for appellant.

DONOVAN, Presiding Judge.

{¶ 1} This matter is before the court on the notice of appeal of Jessica Spradlin, filed September 15, 2009. On April 1, 2008, Spradlin was indicted on one count of possession of crack cocaine in an amount equal to or greater than 100 grams in violation of R.C. 2925.11(A), with a major-drug-offender specification; one count of possession of marijuana in an amount that equaled or exceeded 1,000 grams but was less than 5,000 grams; one count of illegal manufacture of drugs (Schedule I or II) in violation of R.C. 2925.04(A); and one count of possession of cocaine in an amount that equaled or exceeded 25 grams but was less than 100 grams in violation of R.C. 2925.11(A). Indicted with Spradlin were codefendants Dwayne Jones and Raymond McDaniel.

{¶ 2} Spradlin pleaded not guilty, and on May 20, 2008, she filed a motion to suppress. Following a hearing, the trial court denied the motion. Spradlin filed a motion for reconsideration, which the state opposed. The trial court overruled the motion. Spradlin then filed a "Motion of Defendant to Vacate Denial of Motion to Suppress and to forthwith Grant the Motion Instanter." The state opposed the motion, and Spradlin replied. Spradlin then filed a motion to reconsider the denial of her motion to reconsider the denial of her motion to suppress, and the state opposed the motion. On July 16, 2009, the trial court overruled Spradlin's motions.

{¶ 3} The defendants moved the court to sever their cases for trial, and the court granted the motion. On July 20, 2009, Spradlin waived her right to a trial by jury. Prior to trial, McDaniel was killed. Spradlin's bench trial was ultimately conducted simultaneously with Jones's trial by jury with the consent of all parties. On August 7, 2009, the trial court filed individually signed entries finding Spradlin guilty of the offense of illegal manufacture of drugs, a felony of the second degree, and not guilty of the remaining offenses and the major-drug-offender specification.

{¶ 4} On August 7, Spradlin filed a "Motion for Judgment of Acquittal Notwithstanding the Verdict of Guilty on the Twelfth Count of the Indictment; Alternative Motions for New Trial or Guilty of Lesser Included Offense." On August 13, 2009, the trial court again filed signed forms for each offense.

{¶ 5} On August 17, 2009, Spradlin filed a "Supplemental Memorandum to Rule 29(C) Motion." The state filed a "Memorandum Contra Defendant's Motion for Judgment of Acquittal Notwithstanding the Verdict." Spradlin filed a reply. The trial court did not issue a ruling.

{¶ 6} On September 8, 2009, Spradlin was sentenced to a prison term of three years, and the trial court suspended her driver's license for two years.

{¶ 7} At the July 29, 2008 hearing on the motion to suppress, Scott Donley, a parole officer with the Adult Parole Authority and a former member of the Southern Ohio Fugitive Apprehension Strike Team ("SOFAST"), and Rodney Barrett, a detective in the narcotics bureau with the Dayton Police Department, testified for the state. Spradlin testified on her own behalf, and Barrett was called on rebuttal.

{¶ 8} According to Donley, he had been deputized as part of SOFAST to apprehend persons with outstanding warrants, including McDaniel. A "wanted" poster of McDaniel was admitted into evidence, and it provided: "Raymond 'Bird' McDaniel is wanted by the United States Marshals Service for felonious assault with a deadly weapon. McDaniel is wanted in connection with a shooting that left a man paralyzed. McDaniel should be considered armed and dangerous." Donley had received a tip that McDaniel might be located at a basement apartment at 2011 Riverside Drive, which is where Spradlin lived with Jones. Donley and four other officers proceeded to that location at approximately 10:30 in the morning on March 24, 2008. According to Donley, he and the other officers observed the building from the outside for about 30 minutes, and upon reaching the apartment, knocked repeatedly on the door for 25 minutes. Donley testified: "And then during that time we were able to make contact with Miss Spradlin * * * through the door, and began having banter back and forth trying to get her to open the door." Donley stated that they identified themselves to Spradlin. Donley heard "scurrying around and moving around, things moving

around inside the door," and "[p]eople within the house, and I believe you could hear conversations, whispering." Eventually, Donley heard McDaniel say, "I'm in here," and then, "That's me; I'm in here," and the door opened. Donley testified: "McDaniel was arrested inside the doorway and ordered to the ground, placed in handcuffs, and then we went inside the house to clear the house." Donley stated that he had to step over McDaniel inside the apartment.

{¶ 9} In addition to Spradlin, Jones was also inside the apartment, walking around in the back of the apartment. From the doorway, the officers had a view of the living area, but they could not see the kitchen area, the two bedrooms or the bathroom. According to Donley, given the amount of time it took for Spradlin to open the door, and given the sounds coming from inside the apartment while the door was closed, the officers assumed there were other people inside the apartment. For their safety, the officers handcuffed Spradlin and Jones and placed them on the living room sofa. They were not under arrest, Donley testified, but "they were being investigated for possible obstruction charges because of the length of time that they were taking to answer the door and they were keeping us from arresting Mr. McDaniel."

{¶ 10} Donley stated that in performing the sweep of the house, the officers were looking for additional people. After lifting a bed skirt to look under the bed in one of the bedrooms, Donley observed a large shopping bag on its side, with the open end facing directly towards him, and it was full of several gallon-size freezer bags of marijuana. He also recognized the smell of marijuana. He did not touch the items and contacted Barrett at home and advised him about the marijuana so that Barrett could secure a search warrant for the apartment. While the officers waited, Spradlin stated that she was pregnant, and she asked to use the bathroom. After being told that the bathroom would first have to be searched for weapons, Spradlin gave her consent to the search of the bathroom. According to Donley, "we went in and searched it and found a firearm inside the tank of the toilet, and there was a bag of suspected cocaine." Donley Mirandized all three defendants.

{¶ 11} According to Barrett, he secured the subsequent search warrant, after initially responding to the apartment to gain information for the affidavit. Barrett advised Spradlin of her rights, she agreed to speak to him, and he interviewed her for three to five minutes before she terminated the interview. When Barrett returned about two hours later with the search warrant, the apartment was searched. At the time, the three defendants had been transported to the jail.

{¶ 12} Spradlin testified that she is 21 years old and that she was expecting a baby on October 12. Spradlin was leasing the apartment where the above events took place, and Jones was her boyfriend and is the father of her baby. Spradlin

had lived in the apartment for less than a month when she was arrested. On the morning of March 24, Spradlin maintained, she awoke to "a big bang at the door, like bang, bang, bang!" She said that when she looked out the window, she saw "a man outside with a big gun, and he had on just like normal jeans and a shirt." She did not see any police officers or police cars, and she did not open the door, because she did not know who was knocking. Spradlin and Jones approached the door, and the men outside stated that they were police officers and that they would leave as soon as they found the person they were looking for. Spradlin and Jones sat down on the couch, and McDaniel approached the door. Spradlin recognized him as Jones's friend, and she was unaware that he had spent the night in the apartment. Spradlin stated that McDaniel had stayed at their apartment recently when he was having problems with his girlfriend.

{¶ 13} According to Spradlin, McDaniel opened the door, and the officers, with guns drawn, told him to put his hands up. Spradlin stated that the officers instructed him to get on the ground and that when he did so, "he was completely outside the door." Spradlin testified that the officers returned McDaniel to the apartment and they asked her and Jones if anyone else was present. Spradlin said no, and "another officer that was there, the one that handcuffed us, he went off into the kitchen, and he just started slamming, opening up the drawers and the cabinets. All we could hear was the slamming of the doors." Spradlin stated that in the course of the search of the apartment, "they said that they had found something, but by that time another officer had took me outside, and he was like asking me about drugs and weapons and stuff. And I just told him, 'Like, I don't—I don't know what you're talking about.' And I said, 'All right, you're supposed to have a search warrant anyways for, you know, they're ramshacking (sic) through everything.'" Spradlin stated that she asked to use the bathroom immediately before being taken to jail, and at that time, the officers had "already been in there [without Spradlin's consent] and found whatever they found in the bathroom. That's why they said they were taking me to jail."

{¶ 14} Barrett was recalled to the stand, and he testified regarding the police report he authored, which provided in part that Spradlin opened the door after five to ten minutes of knocking and that the officers then observed McDaniel in the back of the apartment.

{¶ 15} In denying the motion to suppress, the trial court determined that the officers were entitled to conduct a protective sweep of the house. It was significant to the trial court that McDaniel was suspected to be armed and dangerous and that the officers heard noises and voices inside the apartment during the delay before the door was opened. The court further determined that the marijuana was in plain view and that its smell, recognized by Donley, was sufficient to establish probable cause. Regarding the search of the bathroom, the

court determined that the surrounding circumstances "are largely a factual issue," concluding that the officers searched the toilet tank prior to Spradlin's use of the bathroom for their safety. Finally, the court determined that any statements made by Spradlin were "after a knowing, intelligent, and voluntary waiver."

{¶ 16} At trial, the following witnesses provided testimony for the state relevant to Spradlin's conviction: Donley; Barrett; Andrew Siefring, a parole officer who responded to Spradlin's apartment on March 24, 2008; Rick Fleming of the Springfield Police Department, who also responded to Spradlin's apartment; and Brooke Ehlers, a forensic chemist at the Miami Valley Regional Crime Laboratory. Timothy Duerr, a forensic scientist for the Miami Valley Regional Crime Laboratory, and Detective Daryl Smith of the Dayton Police Department were called by Spradlin, and Spradlin testified on her own behalf.

{¶ 17} Donley testified that he found digital scales and a box of baggies in the bag of marijuana under the bed. Siefring testified that he performed the search of the bathroom prior to Spradlin's use thereof and that he found "a black Glock 40, as well as suspected crack cocaine" in the toilet tank.

{¶ 18} Fleming testified that he assisted in executing the search warrant at Spradlin's apartment. Fleming stated that he found $8,200 and four handguns in the other bedroom of the apartment, under a dresser. Fleming did not know whose bedroom it was, but the room also contained men's and women's clothing. There was women's clothing in a dresser in the room. Fleming also found a pill bottle containing alprazolam in the dresser.

{¶ 19} Barrett testified that Jones told him the bedroom where the guns and money were found was his bedroom, and Spradlin also indicated that the bedroom was hers.

{¶ 20} Ehlers testified that the drugs seized from the apartment were submitted to her for analysis, and she identified marijuana with a net weight of 1,537.95 grams, crack cocaine with a net weight of 122.35 grams, cocaine with a net weight of 88.30 grams, smaller amounts of crack cocaine and amounts of cocaine residue. According to Ehlers, "[a] controlled substance is something that is regulated by the Ohio Board of Pharmacy as a dangerous type of drug. They are placed into five different categories based on their potential for abuse and the Schedule I being the most severe, Schedule V being the least severe." Ehlers testified that cocaine and crack cocaine are both Schedule II controlled substances, and marijuana is a Schedule I controlled substance.

{¶ 21} Barrett testified regarding a photograph of the kitchen in the apartment, stating that it was taken to "show that it's a house that someone lives in and uses on a daily basis. A lot of times when we come into drug houses, if

they're set up just to sell drugs out of, or they sell smaller quantities of drugs, the only thing you find in there is a TV, sometimes just like a Playstation, just something to pass the time while they're dealing the drugs, usually no one will live there. And then you get some of your larger quantities of drugs where people keep it where they live, that's what we were showing here; that this is a house that someone lives in and that uses on a daily basis and stays overnight in." Barrett stated that two digital scales were found under the kitchen sink and that they contained "a lot of white powder, which we also scraped as much as we could off * * * which was later found to be cocaine." Also under the sink Barrett found "a Pyrex dish, a measuring bowl, * * * a two-cup size glass and inside of that * * * was a spoon or fork that had cocaine residue." Barrett also found "two forks and a knife * * * underneath the kitchen cabinets with the microwave above it. There was a fork actually in the Pyrex dish there and then there was a knife and the other fork and all three are caked with cocaine or crack-cocaine residue on them." Barrett also retrieved an "aluminum pan with cocaine residue in it."

{¶ 22} Barrett further testified, "[W]hen we got back to our office to weigh out and to start tagging up the property, we noticed that the * * * crack cocaine that was recovered in the back of the toilet had the same shape as the bottom of the Pyrex dish. It's very common * * * [that] crack cocaine is cooked, using a microwave." Barrett stated that the piece of crack cocaine fit into the dish and "covers half or slightly more than half of the bottom of the Pyrex dish." Another piece retrieved from the toilet also fit inside the Pyrex dish, covering about a quarter of it.

{¶ 23} Barrett also recovered a box of baking soda, and he testified that baking soda "is one of the key ingredients in making crack-cocaine." According to Barrett, he has seen baking soda used to manufacture crack "[h]undreds of times. In the houses that we do search warrants in and in the street crews when we go in and nuisance abate a house for drug complaints, there's almost always baking soda in the residence * * * with a microwave or a stove, some kind of heat source to change the cocaine into crack." According to Barrett, the interior of the microwave in Spradlin's kitchen "was caked with pieces of crack cocaine, as when they're cooking it in the Pyrex dish, just like you would at home, if you don't put a cover over your microwaved food, it would explode and go all over in the microwave. The microwave that we recovered had crack all over inside of it." Barrett testified, "With everything it takes to make crack [that] was in that house, * * * I would say 99 percent sure crack was cooked in that house."

{¶ 24} Duerr's and Smith's testimony linked the firearm found in the toilet tank to the felonious assault for which McDaniel was wanted.

{¶ 25} Spradlin's testimony was consistent with her statements at the suppression hearing. Spradlin stated, "[A]lmost immediately when they came into my apartment we were arrested because they had went straight, directly to the bathroom and lifted the tank and found the drugs. And like I said, I was not allowed to go into the restroom without being searched by a woman, which was not there until Dayton Police arrived to take me downtown and Dwayne downtown. So, the events that—how [the officers are] claiming that it happened is incorrect." Spradlin testified that she had never seen the drugs or guns or money found in her apartment. On cross-examination, Spradlin stated that the officers who knocked on her door never identified themselves.

{¶ 26} The trial court addressed Spradlin as follows at sentencing: "[T]he Court found that you were guilty beyond a reasonable doubt of illegal manufacture of drugs, and that you aided and abetted them in doing it. By allowing people to come in and out of your house, you knew what was going on. It could be concluded beyond a reasonable doubt that you had knowledge of what was going on."

{¶ 27} Spradlin asserts four assignments of error. Her first assignment of error is as follows:

{¶ 28} "The trial court prejudicially erred in overruling the motion to suppress evidence violating the federal Fourth Amendment and Art. I, Section 14, Ohio Constitution rights."

{¶ 29} "Appellate courts give great deference to the factual findings of the trier of facts. At a suppression hearing, the trial court serves as the trier of fact, and must judge the credibility of witnesses and the weight of the evidence. The trial court is in the best position to resolve questions of fact and evaluate witness credibility. In reviewing a trial court's decision on a motion to suppress, an appellate court accepts the trial court's factual findings, relies on the trial court's ability to assess the credibility of witnesses, and independently determines whether the trial court applied the proper legal standard to the facts as found. An appellate court is bound to accept the trial court's factual findings as long as they are supported by competent, credible evidence." (Citations omitted.) *State v. Hurt*, Montgomery App. No. 21009, 2006-Ohio-990, 2006 WL 522388, ¶ 16.

{¶ 30} According to Spradlin, there "is no question here that there was nothing to suggest any threat of danger from others when the officers searched the apartment." "A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Maryland v. Buie* (1990), 494 U.S. 325, 327, 110 S.Ct. 1093, 108 L.Ed.2d 276. "The risk of danger in the context of an arrest

in the home is as great, if not greater than, it is in an on-the-street or roadside investigatory encounter. * * * A protective sweep * * * occurs as an adjunct to the serious step of taking a person into custody for the purpose of prosecuting him for a crime. Moreover, unlike an encounter on the street or along a highway, an in-home arrest puts the officer at the disadvantage of being on his adversary's 'turf.' An ambush in a confined setting or unknown configuration is more to be feared than it is in open, more familiar surroundings." Id. at 333, 110 S.Ct. 1093, 108 L.Ed.2d 276.

{¶ 31} Spradlin relies upon *State v. Sharpe*, 174 Ohio App.3d 498, 2008-Ohio-267, 882 N.E.2d 960, which we find distinguishable from the facts herein. In *Sharpe*, police responded to a residence on a complaint of domestic violence. Sharpe was not present, and the officers later returned to the residence on a report that Sharpe had entered the residence through a rear window. "A series of squad units" eventually surrounded the residence, where they remained for two to three hours without approaching the door to the home. During that time, no one entered or left the home. Eventually, a family member talked Sharpe into surrendering. After he was taken into custody, no gun was found on his person.

{¶ 32} The police then conducted a sweep of the residence, although they did not know if anyone else was present and "just wanted to make sure that no one else was inside." In the course of their sweep, police found marijuana in plain view, and subsequently obtained a warrant to search the home. In an amended motion to suppress, Sharpe challenged the protective sweep of his home, "contending that the illegality of the protective sweep tainted the facts set out in the affidavit concerning drugs officers found in his house, on which the warrant to search the house for drugs was issued." The trial court denied the motion to suppress, finding that the protective sweep was authorized by *Buie*.

{¶ 33} In reversing the trial court, we determined: "[N]o other perpetrators were implicated in the domestic violence offense on which the warrant for Sharpe's arrest was issued. Further, when Sharpe was arrested, police had surrounded his residence for two to three hours, and during that time saw no one else go in or come out. * * * [P]olice had no information indicating that anyone else was inside the house." *Buie* requires "some positive indication that another person or persons remain in the residential premises where a subject is arrested and that they pose a threat to the safety of officers or others. Lacking that indication, there is not a need to act sufficient to avoid the requirement or a prior warrant if the house is to be searched after a defendant's arrest there. Likewise, not knowing whether anyone else is there is an insufficient pretext because the need for protection necessarily implies that another person or persons are there. Faced with such doubts, and *absent any reason to believe that other persons may*

*be inside,* officers must obtain a warrant before they conduct a search of a defendant's house after a defendant's arrest there." (Emphasis added.)

{¶ 34} McDaniel was wanted for felonious assault with a deadly weapon in connection with a shooting that left a man paralyzed. While repeatedly knocking on the door of Spradlin's apartment for 25 minutes, Donley stated that he heard "scurrying around and moving around, things moving around inside the door," and "people within the house," and "conversations, whispering." Upon entering the apartment and finding McDaniel, the officers also encountered Spradlin and Jones, who was walking around in the rear of the apartment. At that time, they were unable to view the entirety of the apartment, including the kitchen, bedrooms and bathroom, and given the noises they had heard prior to entry, they had reason to believe that other persons could be inside. The fact that the officers had legitimate reason to believe that other persons were present in the apartment, a fact confirmed by the presence of Jones and Spradlin, is significant and distinguishes this case from *Sharpe.* Importantly, the officers expressed concern for their safety.

{¶ 35} On this record, we agree with the trial court that the officers had a reasonable and articulable suspicion that following McDaniel's arrest, other persons besides Spradlin and Jones, who could pose a risk to the safety of the officers, remained inside the apartment. Therefore, the trial court correctly concluded that the protective-sweep exception announced in *Buie* permitted the warrantless, limited sweep of Spradlin's apartment that the officers performed. While Spradlin asserted that the officers' initial search exceeded the scope of a protective sweep, the trial court clearly found Donley's version of events more credible, and we defer to the trial court's assessment of witness credibility. There being no merit to Spradlin's first assignment of error, it is overruled.

{¶ 36} Spradlin's second assignment of error is as follows:

{¶ 37} "The conviction must be vacated because it is not supported by sufficient evidence and violates due process of law."

{¶ 38} "In reviewing a claim of insufficient evidence, '[t]he relevant inquiry is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, following *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560; see, also, *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541." *State v. McKnight,* 107 Ohio St.3d 101, 112, 2005-Ohio-6046, 837 N.E.2d 315, ¶ 70.

{¶ 39} R.C. 2925.04 provides, "(A) No person shall * * * knowingly manufacture or otherwise engage in any part of the production of a controlled substance."

"A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B). " 'Manufacture' means to plant, cultivate, harvest, make, prepare, or otherwise engage in any part of the production of a drug, by propogation, extraction, chemical synthesis, or compounding, or any combination of the same, and includes packaging, repacking, labeling, and other activities incident to production." R.C. 2925.01(J).

{¶ 40} R.C. 2923.03(A)(2) provides, "No person, acting with the kind of culpability required for the commission of an offense, shall * * * [a]id or abet another in the committing the offense." "Whoever violates this section is guilty of complicity in the commission of an offense, and shall be prosecuted and punished as if he were a principal offender. A charge of complicity may be stated in terms of this section, or in terms of the principal offense." R.C. 2923.03(F). "To support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime." *State v. Johnson* (2001), 93 Ohio St.3d 240, 754 N.E.2d 796, syllabus.

{¶ 41} It was undisputed that the apartment was leased to Spradlin. Barrett described the nature of the evidence recovered in the apartment as being consistent with an operation where "larger quantities of drugs" are sold by the inhabitants of the premises. In the kitchen were digital scales containing cocaine, a Pyrex dish, measuring bowl and silverware "caked with cocaine or crack cocaine residue." An aluminum pan also contained cocaine residue. Portions of the crack cocaine that was recovered from the toilet tank matched the shape of the bottom of the Pyrex dish. Baking soda, one of the key ingredients in making crack cocaine, was also found in the kitchen. The interior of the microwave had crack all over the inside. Reviewing the evidence in a light most favorable to the state, and given the above surrounding circumstances, a trier of fact could reasonably conclude at a minimum that Spradlin knowingly supported, assisted, encouraged, cooperated with, advised, or incited her codefendants in the illegal manufacture of crack cocaine, and that she shared the criminal intent of her codefendants. In other words, the trier of fact could have found the essential elements of R.C. 2925.04 proven beyond a reasonable doubt.

{¶ 42} Since Spradlin's conviction is supported by sufficient evidence, her second assignment error is overruled.

{¶ 43} Spradlin's third assignment of error is as follows:

{¶ 44} "The conviction must be vacated because the indictment is defective in failing to include the controlled substance for which the charge of criminal conduct is made."

{¶ 45} We initially note that Spradlin's reliance upon *State v. Colon*, 118 Ohio St.3d 26, 2008-Ohio-1624, 885 N.E.2d 917 (*"Colon I"*), is misplaced. "On April 9, 2008, the Ohio Supreme Court decided *Colon I*, holding that '[w]hen an indictment fails to charge a mens rea element of a crime and the defendant fails to raise that defect in the trial court, the defendant has not waived the defect in the indictment.' *Colon I*, supra, at syllabus. On reconsideration, the Ohio Supreme Court subsequently held in *State v. Colon*, 119 Ohio St.3d 204, 2008-Ohio-3749, 893 N.E.2d 169 (*'Colon II'*), that the rule announced in *Colon I* was prospective in nature and applied 'only to those cases pending on the date *Colon I* was decided.' *Colon II* also limited the syllabus of *Colon I* to its facts and emphasized that structural error analysis was appropriate only in rare cases where multiple errors linked to the defective indictment permeated the proceeding." *State v. Smith*, Clark App. No. 2008–CA–104, 2009-Ohio-6597, 2009 WL 4829874, ¶ 4. *Colon I* does not apply to Spradlin's appeal.

{¶ 46} Crim.R. 7(B) provides that an indictment "shall * * * contain a statement that the defendant has committed a public offense specified in the indictment. * * * The statement may be made in ordinary and concise language without technical averments or allegations not essential to be proved. The statement may be in the words of the applicable statute, provided the words of the statute charge an offense, or in words sufficient to give the defendant notice of all the elements of the offense with which the defendant is charged."

{¶ 47} "If [a] defendant [feels] the indictment was not sufficiently definite * * * it [is] his privilege and duty to request a bill of particulars; in failing to do so or otherwise to raise the issue of insufficiency before trial, as under Crim.R. 12, defendant waive[s] the matter. *State v. Reyna* (1985), 24 Ohio App.3d 79, 493 N.E.2d 555; see also *State v. Yudick* (1951), 155 Ohio St. 269, 98 N.E.2d 415, and R.C. 2941.29." *State v. Strickland* (Dec. 20, 1988), Montgomery App. No. 10968, 1988 WL 137458. Crim.R. 12(C)(2), however, provides that "failure * * * to charge an offense" is an exception to the general rule that failure to object waives the objection.

{¶ 48} R.C. 2925.04(C) provides: "(1) Whoever commits a violation of division (A) of this section that involves any drug other than marihuana is guilty of illegal manufacture of drugs, * * * (2) Except as otherwise provided in this division, if the drug involved in the violation of division (A) of this section is any compound, mixture, preparation, or substance included in schedule I or II, with the exception of methamphetamine or marijuana, illegal manufacture of drugs is a felony of the

second degree, and subject to division (E) of this section, the court shall impose as a mandatory prison term one of the prison terms prescribed for a felony of the second degree."

{¶ 49} Spradlin's indictment provides: "AND the grand jurors of this County, in the name and by the authority of the State of Ohio, upon their oaths, do find and present that: JESSICA L. SPRADLIN, ON OR ABOUT March 24, 2008 in the County of Montgomery, aforesaid, and State of Ohio, did knowingly manufacture or otherwise engage in any part of the production of a controlled substance, a compound mixture, preparation or substance included in Schedule I or II; contrary to the form of the statute (in violation of Section 2925.04(A) of the Ohio Revised Code) * * *."

{¶ 50} If Spradlin doubted the sufficiency of her indictment for the illegal manufacture of drugs, she had a duty to object, and she failed to do so prior to or during the trial. Spradlin's indictment provides that she manufactured a controlled substance contained in Schedule I or II, and this language tracks the statutory language with the specificity of a Schedule I or II drug. The language in R.C. 2925.04 makes clear that marijuana is cultivated, not manufactured or produced, and cultivation was not alleged in the indictment. Although methamphetamine manufacturing is prohibited under this section and methamphetamine is a Schedule I or II drug, there was no evidence regarding methamphetamine and thus no prejudice to Spradlin. Accordingly, we cannot conclude that Spradlin's indictment fails to charge an offense, and waiver applies, pursuant to Crim.R. 12.

{¶ 51} Importantly, there is no evidence that the alleged defect hindered Spradlin's preparation of her defense. The opening statement of counsel for Spradlin makes clear that he was familiar, prior to trial, with the identity of the drug, namely, cocaine, that formed the basis of the charge of illegal manufacture of drugs, and Spradlin accordingly suffered no prejudice.

{¶ 52} There being no merit to Spradlin's third assigned error, it is overruled.

{¶ 53} Spradlin's fourth assignment of error is as follows:

{¶ 54} "The conviction must be vacated because the trial and conviction were based on unfairly prejudicial 'character' evidence and denial of cross-examination, rendering the trial unfair and a denial of due process, and the trial court erred and/or abused its discretion in denying the Rule 29 motion for acquittal."

{¶ 55} We initially note although Spradlin states that the trial court erred in overruling her Crim.R. 29 motion in the text of her assigned error, she offers no argument on the issue. "Crim.R. 29(A) states that a court shall order an entry of judgment of acquittal if the evidence is insufficient to sustain a conviction for the charged offense. 'Reviewing the denial of a Crim.R. 29 motion therefore requires

an appellate court to use the same standard as is used to review a sufficiency of the evidence claim.'" *State v. Thompson,* Montgomery App. No. 22984, 2010-Ohio-1680, 2010 WL 1511496, ¶ 202, quoting *State v. Witcher,* Lucas App. No. L–06–1039, 2007-Ohio-3960, 2007 WL 2216952, ¶ 20. The court having already determined that Spradlin's conviction is supported by sufficient evidence, this argument fails.

{¶ 56} Spradlin objects to the admission of Exhibit 62A, which is a photograph of her and four males, including Jones, recovered from her apartment. Two of the males are holding large amounts of cash, and Spradlin asserts that the "'gangsta' type pose was being considered as indicative of her lifestyle or character and this was prejudicial error. Evid.R. 404(A)."

{¶ 57} Evid.R. 403(A) provides, "Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, * * *." Evid.R. 404(A) provides, "Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion * * *."

{¶ 58} When the state introduced the photograph to Barrett, the following exchange occurred after Spradlin (and Jones) objected:

{¶ 59} "MR. FRENCH: Your Honor, one of the issues in this case is knowledge of the contraband, the drugs, the guns, the money that was in this apartment. Certainly ownership of the apartment, occupancy of the apartment is relevant to establish knowledge * * * perhaps a possessory interest. This is evidence found in this apartment that directly links this apartment and these particular Defendants to this apartment, to the occupancy of the apartment and to possession on a possessory interest of everything in the apartment. I am certainly permitted, and I would argue obligated, to establish knowledge and possession as proof of my case, and this evidence goes directly to establish both.

{¶ 60} "THE COURT: While the Court will note that maybe this is not Jessica Spradlin's best pose, the State does have the obligation. * * * And I would say in looking at sixty-whatever-A, again while that's probably not her best pose, the State has the obligation of determining possession and constructive possession, which one of the elements of constructive possession is to show that people live in this place, that they have a possessory interest, or anything to show that they actually lived there. The Court will overrule that objection."

{¶ 61} When the state later moved for the admission of its exhibits, Spradlin again objected to the admission of the photograph. The court then stated, "I agree that some of the photos show a lack of taste and a—and are not the type of photographs that I have in my living room; however, the police have collected those with their purpose to show who lives in the apartment.

{¶ 62} "The photographs also * * * can be used to show either that * * * Ms. Spradlin and/or Mr. Jones were considered players or wannabes with regard to drug culture. Because you see in those photographs people showing money, the solicitous type poses that are seen on videos and other things that are a part of our human culture.

{¶ 63} "And I think that they are probative. They may not be what you want, but the State has to take the case as they get them, just as the Defense takes the people as they get them.

{¶ 64} "And while you or I may not deal with that or behave in that manner, I think that there is probative value for it. And I'm going to allow it."

{¶ 65} The trial court erred in admitting the photograph for the purpose of showing that Spradlin acted in conformity with the character or reputation suggested by the image. Only highly prejudicial inferences can be drawn from the image of Spradlin, Jones, and other unidentified males, one of which is holding a large sum of money. There is no evidence of drugs depicted in the photograph, and yet the trial court indicated that the photograph "can be used to show * * * Ms. Spradlin and/or Mr. Jones were considered players or wannabes with regard to drug culture." Although the picture was found in her apartment, the location and date of the photograph was unknown. Further, given that Spradlin's possessory interest in the apartment was not disputed, the probative value of the photograph to establish possession was cumulative and outweighed by its prejudicial effect.

{¶ 66} "An error is nevertheless harmless, and must be disregarded, when it does not affect substantial rights. Crim.R. 52(A). If an error would deny a defendant a fair trial, and a substantial right is affected, it is reversible error. It is the burden of a defendant who assigns an error to establish prejudice to that extent." (Citation omitted.) *State v. Ulrich,* Montgomery App. No. 22129, 2008-Ohio-3608, 2008 WL 2809229, ¶ 41. We agree with Spradlin that the trial court's admission of the photograph was highly prejudicial and reversible error. Thus, this portion of her assigned error is sustained.

{¶ 67} Spradlin next argues that the trial court erred in not allowing her to cross-examine Jones. According to Spradlin, she "would have been able to [e]licit testimony helpful to her and demonstrating her lack of knowledge of any illegal use of the microwave oven. The denial of this opportunity was unfairly prejudicial to her defense. The Court claimed that Ms. Spradlin had rested her case. This occurred because the Court unfairly reversed the order in which the Defendants were proceeding all Trial long."

{¶ 68} Spradlin was the final witness to testify in her defense, and after the trial court overruled her Crim.R. 29 motion for acquittal, the jury was brought

back to the courtroom. Curiously, the jury was present when Spradlin cross-examined the state's witnesses, but the jury was removed when Spradlin and her witnesses testified. The trial judge remarked, upon the jury's return, "Ladies and gentlemen, that was a long, what, half-an-hour or whatever it was supposed to be. I can ensure you we have been working. * * * We took care of the bench trial portion. So now we're ready to go on to * * * Mr. Jones' defense, if he chooses to put it on."

{¶ 69} Spradlin testified for Jones, after being warned of her rights not to incriminate herself, and then Jones testified. When Jones's counsel concluded his questioning, the following exchange occurred:

{¶ 70} "MR. O'BRIEN: Your Honor, I'm going to ask * * * am I going to get an opportunity to cross-examine him also?

{¶ 71} "THE COURT: No.

{¶ 72} "MR. O'BRIEN: No. All right. All right."

{¶ 73} At the conclusion of Jones's cross-examination, the following exchange occurred:

{¶ 74} "MR. O'BRIEN: Are you telling me that in the case of Jessica Spradlin, that you [are] preventing me from cross-examining the co-defendant in this case, is that what you said? And is that your ruling?

{¶ 75} "THE COURT: Correct, I'm done. * * *

{¶ 76} "MR. FRENCH: Yeah, his case is over.

{¶ 77} " * * *

{¶ 78} "THE COURT: I said her case is done with. I've heard the evidence. You went through a Rule 49 [sic] motion.

{¶ 79} " * * *

{¶ 80} "THE COURT: * * * We went through your witnesses. You said you had no more witnesses. Why would you cross-examine him if your case—if her case is done with?

{¶ 81} "MR. O'BRIEN: Except I didn't know that he was going to call the co-defendant to the stand, that's the problem that I have.

{¶ 82} " * * *

{¶ 83} "THE COURT: I don't control anybody's case. I do know that the bench trial was separate from the jury trial. And so, what—you cross-examine him, but what need is there? What are you going to do? It's not going to affect her case.

{¶ 84} " * * *

{¶ 85} "MR. O'BRIEN: I think it would be evidence. It'd be like a nature of reopening the case from the standpoint that they have called his client.

{¶ 86} "THE COURT: I've never heard of this.

{¶ 87} " * * *

{¶ 88} "THE COURT: And, you know, it sounds like we're making up stuff as we go. I told you all in the beginning what the problem was with doing it this way. You all wanted to go forward with it.

{¶ 89} "I'm finished with Ms. Spradlin's case. We're dealing with Mr. Carter's case and we're dealing with witnesses that the jury should hear.

{¶ 90} "MR. O'BRIEN: That's your ruling. I just wanted to make sure the record showed it."

{¶ 91} Jones testified that he and McDaniel grew up together. Jones asserted that McDaniel called him on the night of the incident and stated that he had problems with his girlfriend and asked if he could spend the night. When he arrived, he had "a bag." Jones let him in and went to bed. After his arrest, Jones denied knowledge of the drugs, and he denied knowing that McDaniel had drugs when he arrived. On cross-examination, when asked if he was suggesting to the jury that the police planted the evidence, Jones replied, "Nah, I'm trying to tell you it was Raymond's drugs and them guns was his. That's what I'm trying to tell you." According to Jones, "I know for sure that the drugs is Raymond McDaniel's and the other guns is Raymond McDaniel's because he begged me not to tell on him and he begged my girl not to tell. I thought she was going to say it but she ain't said nothing."

{¶ 92} The mode and manner in which Spradlin's bench trial was conducted simultaneously with Jones's trial by jury are unprecedented and ill advised. Portions of Spradlin's trial were presented in front of the jury and other portions were not. Spradlin's counsel conducted cross-examination of the state's witnesses in front of the jury, but when her own case was presented, the jury was removed from the courtroom. Spradlin actually testified twice, once without the jury and later for Jones with the jury present. Although Spradlin's case was presented in this unusual hybrid fashion, it should not have ended before Jones's trial ended, since they were tried together. Spradlin's trial to the bench was erroneously cut short by the trial judge, depriving Spradlin of due process as guaranteed by the Fourteenth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution. Although Spradlin's counsel indicated that he had no further witnesses in Spradlin's case-in-chief, counsel had not formally rested Spradlin's case, and no closing argument had yet been made. In fact, Spradlin's counsel's closing argument was given after Jones had rested. In other words, the trial was still ongoing when Spradlin

sought to question codefendant Jones. This request should have been granted. Spradlin was deprived of the opportunity to ask her codefendant, Jones, questions. We note that Jones did testify regarding Spradlin and the state did cross-examine Jones regarding Spradlin. We agree with Spradlin that the trial court committed reversible error; as fact-finder, the trial court should have considered Jones's testimony in Spradlin's case. Accordingly, Spradlin's fourth assignment of error is sustained, as she was denied due process and a fair trial.

{¶ 93} The judgment of the trial court is reversed, and the matter is remanded for proceedings consistent with this opinion.

Judgment reversed
and cause remanded.

BROGAN and FAIN, JJ., concur.