[Cite as *State v. Young*, 2011-Ohio-4875.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                      :

    Plaintiff-Appellant           :       C.A. CASE NO.    24537

v.                                :       T.C. NO.   09CR4113

TERRY M. YOUNG, III           :      (Criminal appeal from
                                             Common Pleas Court)

    Defendant-Appellee       :

                                  :

. . . . . . . . . .

**O P I N I O N**

Rendered on the    23rd    day of    September   , 2011.

. . . . . . . . . .

TIMOTHY J. COLE, Atty. Reg. No. 0084117, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellant

MICHAEL H. HOLZ, Atty. Reg. No. 0031902, 507 Wilmington Avenue, Dayton, Ohio 45420
        Attorney for Defendant-Appellee

. . . . . . . . . .

CELEBREZZE, J. (by assignment)

{¶ 1} Plaintiff-appellant, the state of Ohio, appeals from the trial court order that granted the motion to suppress evidence filed by defendant-appellee, Terry M. Young, III. After careful review of the record and relevant case law, we reverse the trial court's

judgment and remand the matter for further proceedings.

{¶ 2}   Appellee was indicted on February 2, 2010 for possession of crack cocaine in an amount less than one gram, in violation of R.C. 2925.11(A), a felony of the fifth degree. On January 4, 2011, appellee filed a motion to suppress evidence seized by the police during a warrantless search of his residence.

{¶ 3}   At an evidentiary hearing held on February 8, 2011, a single witness testified, Officer Theodore Trupp of the Dayton Police Department.   Based on Officer Trupp's testimony, the trial court made the following findings of fact:

{¶ 4}   Officer Trupp is a city of Dayton police officer with nine years of experience in a high crime area.  Officer Trupp testified that the residence located at 262 Harbine Avenue has been the source of multiple drug complaints.  On December 7, 2009, the police were called to a residence at 261 Harbine Avenue on a family trouble complaint.  The call was against an individual named Chris Fontecchio.   When the police arrived, the complainant, Fontecchio's mother, advised that her son had left home and was at the neighbor's residence at 262 Harbaine Avenue.  The officers went to 262 Harbine Avenue because they had knowledge that Fontecchio had an outstanding traffic warrant against him.

{¶ 5}   The house at 262 Harbine was described by Officer Trupp as being a two-story, single-family dwelling with front and back porches.  To the left of the front door was a single large window covered by blinds; to the right were several smaller windows covered by sheer curtains.  The officers went to the door, knocked, and announced that they were police officers.  No one answered the door, however, Officer Trupp testified that he heard the sound of people moving around inside.  The officers moved to the front and back

doors and continued to knock.

**{¶ 6}** Officer Trupp testified that, as he looked in the front window, he saw a white male wearing a black hooded sweatshirt open a dresser drawer and grab a black or silver handgun. The male put the handgun in the waistband of his pants and ran into the living room. Several minutes later, the male who was observed grabbing the handgun answered the back door. The officer drew his weapon and ordered this individual to the ground.

**{¶ 7}** A search of the male in the black hooded sweatshirt failed to reveal the handgun that Officer Trupp testified he observed the male put in his waistband. The officers searched for the gun in the areas where people were found, including the living room. No gun was found at that time.

**{¶ 8}** Although the officers heard no sounds coming from the upstairs or downstairs and had seen no one run in either direction, they decided to search the basement and the second floor. Before the officers headed upstairs, appellee told one of the officers that no one was upstairs. The officer admitted that he went upstairs without the consent of anyone. Once upstairs, he observed a wallet containing Young's identification and a clear plastic baggie of suspected crack cocaine on a night stand next to a bed. The suspected crack cocaine was confiscated, and Young was charged with drug possession.

**{¶ 9}** Subsequent to the protective sweep, the officers located the handgun observed by Officer Trupp in the residence, and several individuals, including appellee, were arrested.

**{¶ 10}** On March 10, 2011, the trial court sustained appellee's motion to suppress. The state filed this timely appeal raising one assignment of error:

{¶ 11} "The trial court erred when it found that Young's Fourth Amendment rights were violated when police conducted a protective sweep of the upstairs of the residence."

## Law and Analysis

### Standard of Review

{¶ 12} In considering a motion to suppress, the trial court assumes the role of trier of fact and is in the best position to resolve factual questions and evaluate the credibility of the witnesses. *State v. Mills* (1992), 62 Ohio St.3d 357. Consequently, in reviewing a trial court's decision on a motion to suppress, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. *State v. Curry* (1994), 95 Ohio App.3d 93, 96, citing *State v. Schiebel* (1990), 55 Ohio St.3d 71. An appellate court, however, determines as a matter of law, without deferring to the trial court's conclusions, whether the law has been appropriately applied to those facts. Id., citing *State v. Claytor* (1993), 85 Ohio App.3d 623.

{¶ 13} Here, the trial court's findings of fact are supported by competent, credible evidence; consequently, we focus on the application of the relevant law to those facts.

### Protective Sweep

{¶ 14} The state argues that the trial court erred in granting appellee's motion to suppress because the protective sweep of his home was constitutional. A warrantless search of a home is presumptively unreasonable. *Brigham City, Utah v. Stuart* (2006), 547 U.S. 398, 126 S.Ct. 1943, 164 L.Ed.2d 650. "Nevertheless, because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." Id. One such exception is a protective sweep. *Maryland v. Buie* (1990), 494

U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276. "A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." Id.

{¶ 15} In *Buie,* the United States Supreme Court set forth the standard for a warrantless "protective sweep" of a residence. The Court reasoned:

{¶ 16} "In *Terry* [*v. Ohio* (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889,] and [*Michigan v.*] *Long* [(1983), 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201,] we were concerned with the immediate interest of the police officers in taking steps to assure themselves that the persons with whom they were dealing were not armed with, or able to gain immediate control of, a weapon that could unexpectedly and fatally be used against them. In the instant case, there is an analogous interest of the officers in taking steps to assure themselves that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack. The risk of danger in the context of an arrest in the home is as great as, if not greater than, it is in an on-the-street or roadside investigatory encounter. * * * [U]nlike an encounter on the street or along a highway, an in-home arrest puts the officer at the disadvantage of being on his adversary's 'turf.' An ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings." Id. at 333.

{¶ 17} A protective sweep, however, is not a full search of the premises. It is only a cursory inspection of those areas where a person who possesses a threat of danger to the police may be found. The Supreme Court further held:

{¶ 18} "[A]s incident to the arrest, the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched. Beyond that, however, we hold that there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those arrested on the scene." Id. at 334.

{¶ 19} "By adopting the 'reasonable and articulable suspicion' standard of *Terry* and *Long*, the Supreme Court in *Buie* imposed a circumstantial predicate on the authority conferred on law enforcement officers to conduct a protective sweep of a defendant's residence following his arrest. There must be articulable facts from which police reasonably suspect that the premises in which defendant is arrested harbors another person or persons who may launch an attack on the officers who are there. Absent that basis to act, a protective sweep is an unreasonable search for purposes of the Fourth Amendment, and any incriminating evidence it produces must be suppressed." *State v. Sharpe*, 174 Ohio App.3d 498, 2008-Ohio-267, ¶37.

{¶ 20} Thus, in the case sub judice, this court must determine whether the state met its burden and proved that the officers had "specific and articulable facts" that warranted the protective sweep.

{¶ 21} In granting appellee's motion to suppress, the trial court noted that the officers conducted the search of appellee's residence before any person was placed under arrest. By doing so, the trial court found that the officers "acted outside the parameters set

by the Fourth Amendment to the United States Constitution and also the Ohio Constitution." Further, the trial court stated that, "[s]ince the record does not show any evidence of sounds coming from the attic and because the record does state that the defendant specifically refused to give the officers permission to search the upstairs, this Court cannot find an acceptable reason for the officer to have entered the upstairs bedroom."

{¶ 22} Initially, we disagree with the trial court's position that a protective sweep is only justified subsequent to an arrest. Upon review of the record, we find that Officer Trupp had a reasonable belief that criminal activity had occurred or was about to occur inside the residence, and the officers were clearly justified in detaining the individuals upon entering the house. Therefore, under the facts of this case, any distinction between a "detention" and a formal arrest of appellee is negligible.

{¶ 23} The concern for the safety of officers, which justifies allowing officers to conduct warrantless protective sweeps following the arrest of a suspect, is just as applicable where the suspect has been detained while the officers attempt to ascertain the extent of the situation. In either case, the arresting officers would still have to have a reasonable, articulable suspicion that someone might be in the residence who could pose a threat in order to conduct even a limited protective sweep. Therefore, we hold that the protective sweep exception to the warrant requirement is not rendered inapplicable to this case simply because appellee was detained rather than formally arrested at the time the protective sweep occurred.[1]

---

[1] A majority of courts throughout the country have perceived no difficulty in extending the concept of a protective sweep to situations not involving an arrest, such as a detention or warrant search. (E.g., *State v. Revenaugh* (Idaho 1999),

{¶ 24} Further, we find that Officer Trupp's testimony included specific and articulable facts to justify the extent of the protective sweep of the appellee's residence. This court addressed this issue in *State v. Spradlin*, 187 Ohio App.3d 767, 2010-Ohio-2140. There, the defendant claimed that the protective sweep violated her Fourth Amendment rights and filed a motion to suppress. Officers received a tip that a man wanted in connection with a shooting was in a basement apartment. Officers went to the apartment, knocked, and announced their presence for approximately 25 minutes. While standing outside, the officers heard "scurrying around, things moving inside the door." Further, one officer testified that he heard "people within the house, and I believe you could hear conversation, whispering." The suspect finally opened the door, was ordered to the ground, handcuffed, and arrested in the doorway. When the defendant was asked if there were other people in the home, she said "no." Regardless, officers assumed there were other people in the house because of the voices they heard through the door, but they could not see into the kitchen, the two bedrooms, or the bathroom. Therefore, officers conducted a protective sweep of the house to ensure their safety. The officers found a large bag of marijuana in the bedroom, under the bed, and in a shopping bag.

{¶ 25} This court affirmed the trial court's decision overruling the motion to suppress and held that the protective sweep was warranted given the circumstances. In its

---

133 Idaho 774, 992 P.2d 769, 772-773; *Cotton v. State* (Md.2005), 386 Md. 249, 872 A.2d 87, 90-93; *Nolin v. State* (Fla.Dist.Ct.App.2006), 946 So.2d.52, 55-58, fn. 2; *U.S. v. Maddox* (C.A.10, 2004), 388 F.3d 1356, 1361-1363; see *United States v. Torres-Castro* (C.A.10, 2006), 470 F.3d 992, 996-997; *United States v. Meza-Corrales* (C.A.9, 1999), 183 F.3d 1116; *United States v. Garcia* (C.A.9, 1993), 997 F.2d 1273, 1282.

decision, this court cited to *Buie* and explained, "[t]he fact that the officers had a legitimate reason to believe that other persons were present in the apartment * * * is significant." Further, "the officers expressed their concerns for their safety." As a result, this court found that the officers had a reasonable and articulable suspicion that people "who pose a risk to the safety of the officers, remained in the apartment."

{¶ 26} In the case at bar, officers went to 262 Harbine believing that Fontecchio was in the house. Officer Trupp, an officer with nine years of experience, stated that he had personally responded to drug complaints at 262 Harbine and knew the area to be a high-drug, high crime area. Similar to the circumstances in *Spradlin*, as the officers knocked and announced themselves as Dayton police, they heard shuffling around inside the house and sounds of people running. When no one answered the door, Officer Trupp looked in a window and observed a male inside the house grab a firearm and put it in his waistband. Officer Trupp knew this to be a common area to place a firearm based on his training and experience.

{¶ 27} When the officers finally gained access to the house through the back door, Officer Trupp discovered that the male he saw with the gun no longer had it on his person. Likewise, the other individuals in the kitchen and living room also did not have the gun. Creating further concern, there were upstairs and downstairs areas of the house that were not visible to the officers. The officers believed that the gun was still in the house and possibly with another person. Officer Trupp explained that he went upstairs "[j]ust to make sure that there were no other individuals up there. We still had not located the gun. We didn't know if somebody was up there and armed with a weapon. Just for our safety."

{¶ 28} Based on Officer Trupp's testimony, we find that the officers had a reasonable and articulable suspicion that the upstairs bedroom of the residence harbored an individual who could have posed a risk to the safety of the officers. The officers were placed in a situation where they knew that one or more firearms were located in the residence, but were unable to know, with certainty, how many individuals remained in the residence. Upon detaining the individuals found in the downstairs portion of the residence, the firearm observed by Officer Trupp was not found. Therefore, it was reasonable for the officers to suspect that there was another individual in the residence who could have been a potential threat to their safety.

{¶ 29} Finally, the crack cocaine confiscated by Officer Trupp was lawfully retrieved under the plain view exception to the Fourth Amendment warrant requirement. In order for evidence to be seized under the plain view exception to the search warrant requirement, it must be shown that (1) the initial intrusion that afforded the authorities the plain view was lawful; (2) the discovery of the evidence was inadvertent; and (3) the incriminating nature of the evidence was immediately apparent to the seizing authorities. *State v. Williams* (1978), 55 Ohio St.2d 82, paragraph one of the syllabus.

{¶ 30} We find that the state established that the officers were lawfully in a position to view the crack cocaine, which was readily identifiable and in plain view on appellee's bedroom dresser.

{¶ 31} Based on the foregoing, we find that the trial court incorrectly granted appellee's motion to suppress. The officers were lawfully in a position to observe the crack cocaine, which was in plain view in appellee's room during a protective sweep. Appellant's

sole assignment of error is therefore well-taken.

{¶ 32} This cause is reversed and remanded to the lower court for further proceedings consistent with this opinion.

. . . . . . . . . .

HALL, J., concurs.


FROELICH, J., dissenting:

{¶ 33} The police responded to a call regarding "some issues [Fontecchio's] mother was having" with him; there was no allegation of any violence or of any weapon, but rather that "they had been fighting and causing problems, keeping her up late at night." She said she "believed he was at the house" across the street, an address concerning which there had been previous "drug complaints." Although the record is not clear, it appears that the police, before going across the street, determined that there was a traffic capias for Fontecchio's arrest.

{¶ 34} No one answered their knocking and announcing that they were police; they could "hear shuffling around." One officer looked in the window and saw an unknown individual (not Fontecchio) take a handgun from a dresser and put it in his waistband. The officer informed his colleagues who all drew their weapons and one "went to his cruiser and retrieved his rifle for our safety."

{¶ 35} The officer stated he "didn't know what was going on. . .I don't know what type of criminal activity's going on. . .I need to find out if everybody is okay inside the house." The police knocked at the back door for another minute and indicated they wanted

to be sure everything was okay and that no one was being held hostage. Someone from inside asked, "who is it?" And the police again advised who they were and that the residents "need to open the door" and further indicated that they (the police) "wanted to come in and check that everyone's okay."

{¶ 36} The kitchen door was opened by the person whom they had seen with a weapon; there were two other subjects standing in the kitchen area. The police ordered everyone to the floor and went into the living room where two to three other people were also ordered to the ground; all were patted down.

{¶ 37} Although they did not hear anyone else in the home and one of the people on the floor said no one else was there, the police "went upstairs to make sure nobody else was up there" as well as into the basement. The officers had not located a gun at that point and "didn't know if somebody was up there armed with a weapon." While upstairs, one of the officers saw what he believed to be crack cocaine in plain view; Fontecchio was not in the home.

{¶ 38} The prosecutor argued at the conclusion of the motion that, given the capias, the officers had a valid reason to approach the house, that no one answered despite their announcing their presence, and that they saw one individual obtain a weapon and put it in his waistband; when they made entry and did not find the gun, they "need to ensure their own safety and make a sweep of the upstairs area." "They have not created that emergency merely by being there with a valid reason and knocking on the door and then observing something that causes them to believe that there is someone inside that may be in immediate need of aid."

{¶ 39} "[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment was directed." *Payton v. New York* (1980), 445 U.S. 573, 585, 100 S.Ct. 1371, 63 L.Ed.2d 639. It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable. Id. at 586. Absent exigent circumstances, the threshold may not reasonably be crossed without a warrant. Id. at 590.

{¶ 40} A warrantless seizure of incriminating evidence such as the crack cocaine is permissible under the plain view exception where (1) the officers are lawfully positioned in a place from which the object can be plainly viewed, (2) the incriminating character of the object is immediately apparent, and (3) the officer has a lawful right of access to the object itself. *Boone v. Spurgess* (CA 6, 2004), 385 F.3d 923, 928. It is incumbent upon the State to establish that this exception to the warrant requirement applies. *United States v. Oliver* (CA 6, 1982), 686 F.2d 356, 371.

{¶ 41} Although the officer did not have to move anything to see the crack and the incriminating nature of the drugs was immediately apparent, the question is whether the officer had a lawful right to be in the position from which he observed the drugs.

{¶ 42} The fact that someone inside the house had a firearm does not create probable cause or an articulable suspicion that a law was being violated; for example, possessing a concealed firearm is not unlawful in such a situation. R.C. 2923.12(C)(1)(d). Issues surrounding articulable suspicion, let alone probable cause, have not yet been fleshed out in Ohio since the passage of recent laws concerning the carrying of firearms. In Florida, where it is also not illegal to possess "a concealed gun in a crowd," "stopping a person solely on the

ground that the individual possesses a gun violates the Fourth Amendment." *Bryan v. State* (Fla. App. 4 Dist, 2011), 62 So.3d 1244.

**{¶ 43}** Even if it were illegal, "the 'plain view' doctrine does not authorize warrantless entries into a private home merely because an item of contraband has become visible to those outside. . .[p]lain view alone is never enough to justify the warrantless seizure of evidence. This is simply a corollary of the familiar principle. . .that no amount of probable cause can justify a warrantless search or seizure absent 'exigent circumstances.' Incontrovertible testimony of the senses that an incriminating object is on the premises belonging to a criminal suspect may establish the fullest measure of probable cause. But even where the object is contraband. . .the police may not enter and make a warrantless seizure." *United States v. Morgan* (CA 6 1984), 743 F.2d 1158, 1167, quoting *Coolidge v. New Hampshire* (1971), 403 U.S. 443 at 486, 91 S.Ct.2022, 29 L.Ed.2d 564. That is what happened here.

**{¶ 44}** There was nothing unconstitutional about the police knocking on the door and if, when the door voluntarily swung open, contraband were in plain view, there may be no problem with the police entering. For example, the Second Circuit has held that "what a person knowingly exposes to the public, even in his own house or office, is not subject of Fourth Amendment protection." *United States v. Gori* (CA 2, 2000), 230 F.3d 44. But, see, *Hadley v. Williams* (CA 7, 2004), 368 F.3d 747.

**{¶ 45}** The police, at gunpoint, ordered everyone to the floor and patted them all down. In order to justify such a protective search, the surrounding circumstances must create a suspicion that an individual may be armed and dangerous. *Terry v. Ohio* (1968),

392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889. "[F]acts supporting a reasonable and articulable suspicion that a person is armed [do] not necessarily support a reasonable and articulable suspicion that the person is dangerous." *State v. Jordan*, Montgomery App. No. 22271, 2008-Ohio-199, ¶17 (Wolff, P.J., concurring).

**{¶ 46}** Here, the police initially approached a house thinking that a person with a traffic capias was there. After seeing a different person inside with a gun, they concluded that there was illegal activity occurring or that someone was being held hostage, drew their weapons, went to all the doors, and demanded the people inside open the door. When the person who was observed with the gun opened the back door, the officers patted him and others down. Although, in their experience, the officers may have had a hunch or concern that something illegal was occurring, they had no probable cause of any criminal activity or any articulable suspicion that any of the individuals they patted down was armed <u>and</u> dangerous.

**{¶ 47}** Rather, the State argues that they were lawfully in the bedroom as a result of a protective sweep.[2] The United States Supreme Court has held that a protective sweep is permissible if the officer "possess[es] a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant the officer in believing that the area swept harbored an individual posing a danger to the officer or others." (Internal citations omitted*). Maryland v. Buie* (1990), 494 U.S. 325,

---

[2]As mentioned above, the prosecutor also argued at the motion to suppress hearing that they believed someone was in need of immediate aid and that someone might be held hostage.

327. Thus, officers must have "articulable facts, which, taken together with the reasonable inferences from those facts, would warrant the reasonably prudent officer believing that the area to be swept harbors an individual imposing a danger to those on the arrest scene." *Buie*, 494 U.S. at 334.

{¶ 48} Very recently, the Supreme Court addressed a situation where police officers had followed a suspected drug dealer to an apartment complex. *Kentucky v. King* (2011), _____ U.S. _____, 131 S.Ct. 1849, 179 L.Ed.2d 865. They smelled burnt marijuana outside an apartment door, knocked loudly, and announced their presence. As soon as the officers began knocking, they heard noises coming from the apartment which the officers, based on their experience, believed were consistent with the destruction of evidence. The officers announced their intent to enter the apartment, kicked in the door, and found the defendant and others. They saw drugs in plain view during a protective sweep of the apartment and found additional evidence during a subsequent search. The Supreme Court held that the exigent circumstances rule applies since the police did not create the exigency by engaging or threatening to engage in conduct that violates the Fourth Amendment.

{¶ 49} Justice Ginsburg dissented saying, "the court today arms the police with a way routinely to dishonor the Fourth Amendment warrant requirement in drug cases. In lieu of presenting their evidence to a neutral magistrate, police officers may now knock, listen, then break the door down, never mind that they had ample time to obtain a warrant [before arriving at suspect's home]. . . The question presented: May police, who could pause to gain the approval of a neutral magistrate, dispense with the need to get a warrant by themselves creating exigent circumstances? I would answer no. . . .the urgency must exist, I

would rule, when the police come on the scene, not subsequent to their arrival, prompted by their own conduct."  Id. at _____ U.S. _____, 131 S.Ct. 1864.

{¶ 50} The case now before us does not involve an articulable suspicion of drugs, does not involve any sights or sounds indicating the destruction of evidence, does not involve facts indicating that any possible individual upstairs poses a danger to them, and, in brief, involves no exigent circumstances whatsoever.

{¶ 51} The police saw an individual in the home with a concealed weapon; they knocked on the door announcing their presence and ordering the residents to open the door; when the individual opened the door, all the residents were ordered at gunpoint to the floor and patted down and a sweep of the entire residence was conducted during which drugs were observed.

{¶ 52} It is certainly understandable that once someone opened the door the police erred on the side of safety; however,  such a legitimate cautiousness cannot evade Fourth Amendment scrutiny.  There was no *Terry* justification to enter the home and pat down the individuals; there was no *Buie* justification to sweep the upstairs and there was no *King* justification to look for drugs or the destruction of evidence.  In this case, a search (albeit designated as a sweep) has been bootstrapped from a mother's calling the police with a complaint that her son continues to argue with her and keeps her up all night.  The trial court determined that there was no exigency or other justification for the officers' presence in the bedroom where the crack cocaine was found and I would affirm that decision.

. . . . . . . . . .

(Hon. Frank D. Celebrezze, Jr., Eighth District Court of Appeals, sitting by assignment of the Chief Justice of the Supreme Court of Ohio).

Copies mailed to:

Timothy J. Cole
Michael H. Holz
Hon. Frances E. McGee