The STATE of Ohio, Appellee,

v.

LYONS, Appellant.

[Cite as *State v. Lyons* (1992), 83 Ohio App.3d 525.]

Court of Appeals of Ohio,
Darke County.

No. 1291.

Decided Nov. 6, 1992.

*Mark Heggie,* Assistant Prosecuting Attorney, for appellee.
*Ronald E. Reichard,* for appellant.

FAIN, Presiding Judge.

Defendant-appellant Michael D. Lyons appeals from his conviction and sentence on two counts of aggravated trafficking, two counts of trafficking in marijuana, one count of drug abuse and one count of possessing criminal tools. Lyons contends that the trial court should have suppressed evidence seized at his home because the seizure of that evidence was the result of a warrantless search of his home at the time of his arrest that violated the Fourth Amendment to the Constitution of the United States. Lyons also contends that the prosecutor made improper comments during closing argument.

We conclude that the trial court properly denied Lyons's motion to suppress. All but one of the prosecutorial comments of which Lyons complained were not

objected to during the course of the trial. These comments do not, in our view, rise to the level of plain error. The one comment that was objected to did not, in our view, amount to prejudicial error. Accordingly, the judgment of the trial court is affirmed.

## I

In April 1989, nine law enforcement officers, including Special Agent John Finnegan of the Federal Bureau of Investigation, executed a federal warrant to arrest Lyons at his home in Darke County. The arrest was effected shortly before 11:00 in the morning. All nine officers were armed, and all nine were wearing bullet-proof vests. The charges for which Lyons was being arrested involved an alleged narcotics enterprise involving the distribution of 285,000 pounds of marijuana. Lyons was one of twenty persons being arrested in connection with these charges. At least one other person had not yet been arrested, and was believed to be in this area.

At least one uniformed and one non-uniformed officer covered each door to Lyons's residence, which was in a rural area, well back from the road. The officers were concerned that they could not see into either the first-floor or second-floor windows to the residence, and there was very little "cover" between the road and the house.

The team of officers at the front door knocked on the door. There was no response for four to five minutes. Finally, Lyons came to the door. He was clothed only from the waist down, either in blue jeans or sweat pants.

Several of the officers testified that Lyons appeared to them as though he had just been aroused from a sound sleep. One officer testified that Lyons appeared to be under the influence of drugs.

Special Agent Finnegan immediately and urgently began questioning Lyons to ascertain his identity. Interspersed with his questions addressed to Lyons's identity were questions about whether there was anyone else in the house.

With some difficulty, perhaps as a result of Lyons's unalert mental condition, Finnegan was able to establish his identity. At no point did Lyons ever answer Finnegan's frequent and urgent questions concerning whether there was anyone else in the house. As soon as Lyons's identity was established, if not earlier, Lyons was taken down to a horizontal position and handcuffed. This occurred in the threshold of Lyons's residence, with Lyons lying partly inside and partly outside.

At about the time that Lyons was being handcuffed, Finnegan asked Detective Roger Shellabarger of the Darke County Sheriff's Office to make sure that there was no one else in the house who could harm the officers. Shellabarger

proceeded to make a sweep through the house, looking in every place where someone might be. After he checked all the rooms and doors on the first floor, he went upstairs, his shotgun at the ready, and looked in all the rooms and doors on the second floor. Shellabarger testified that he was looking in every place where someone might be hiding.

In a closet on the second floor, Shellabarger found drugs and drug paraphernalia. He testified that he did not know what would be behind the door, and was not even sure that it was a closet, although he thought that it was. He testified that he was simply looking for anyone who might be hiding, who might pose a threat to the officers.

Meanwhile, Finnegan and the officers in Lyons's presence found some slippers or sandals for Lyons and a shirt. These items were evidently found in the main room on the first floor. As soon as Lyons was clothed with the slippers and shirt, he was taken outside and transported to the Darke County Sheriff's Office, where he was fed. He had told the officers that he had not yet eaten that morning.

Detective Larry Dickey testified that it was only about two to three minutes from the time that Lyons answered the door to the time that he was taken outside to be transported. Shellabarger testified that it was about five or six minutes before Lyons was taken outside, and that his sweep of the house consumed two to three minutes. From the testimony, it is not clear whether Shellabarger completed his sweep before Lyons was taken outside, but it is clear that both of these events happened quickly.

Several officers, including Special Agent Finnegan, testified that they saw several firearms in plain view in the main room on the first floor. These included both long-barrelled weapons and handguns. One handgun was seen protruding underneath a couch on the first floor.

Several officers testified that the couch appeared to have been slept in. Several officers testified that the ashtrays on the first floor were full, and that there were numerous beverage containers on the first floor. At least one officer testified that it looked as though there had been a party at the residence. Several officers testified that the residence had a reputation for parties.

All of the officers who testified said that they were concerned about the possibility that there might be other people in the house, although none offered any direct evidence that there was someone else there.

Several of the officers testified that Lyons did not have a reputation for violence, but Shellabarger testified that a group of persons associated with Lyons had a reputation for being quite violent.

Based upon Shellabarger's observation of the drugs and drug paraphernalia in a closet, a search warrant was issued and executed later in the day. This search resulted in the seizure of additional evidence.

Although Lyons was acquitted in a Louisiana federal court of the charges for which he was arrested, he was charged in Darke County with having a weapon under disability, two counts of aggravated trafficking, two counts of trafficking in marijuana, one count of drug abuse and one count of possession of criminal tools. Lyons moved to suppress the evidence, contending that the evidence was obtained as a result of an illegal search of his house at the time of his arrest. This motion was heard, and the trial court overruled the motion.

During the closing arguments at trial, Lyons's attorney suggested that Lyons had been framed by Special Agent Finnegan, who had an "agenda" to get Lyons. Lyons's attorney argued that the state would do anything to get a conviction. In rebuttal, the prosecutor made the following comments:

"Mr. Reichard [Lyons's attorney] talked to you about agenda. He suggested that there's corruption here. The only agenda in this case has been seen from the defense. What was the start of his description of the agenda?

"The search warrant affidavit and the additional things in there. And, I believe, he mentioned the defendant's brother's death, the sex parties, the surveillance.

"Read the affidavit when you go back to the jury room, folks, and none of this is in there. Mr. Reichard talked about it. It isn't in here. We didn't ask any of the witnesses about it.

"Mr. Reichard cross-examined mine. He's the one who has been trying to pry it out because it's part of the deceit. There's no agenda but deceit. He mocked Tim Duerr [an expert witness for the state], his two weeks.

"He forgot the six months training at BCI. He forgot all the other stuff. He's been out longer than Mr. Reichard said. He forgot the other tests he said he ran. Let's face it, he's got nothing.

"He had access to that evidence. His expert—

"MR. REICHARD: Objection.

"THE COURT: Overruled. Closing statement.

"MR. REICHARD: Your Honor, he's talking about a witness who isn't here; who has never been here.

"MR. HEGGIE [representing the state]: That's right.

"THE COURT: Closing statement. Overrule the objection.

"MR. HEGGIE: The witness wasn't here. There was no witness here to challenge that analysis by Tim Duerr. Why? Don't you believe it's because those are really the drugs?

"Now, I am not going to try to rebut every single little point he made because some of them I would not even signify [sic] with a reply. The big frame up. Where is John? Did he leave?

"Perry Mason would jump up and say yeah, I did it. This is not Perry Mason. Now, how in the world could John Finnegan keep Mike Lyons under surveillance long enough to find out he left the house on Sunday night, and how would he know how long he was going to be gone?

"And how would he get all of that stuff in by himself and hide it in that house and set up this picture two and-a-half hours when he didn't even know—nobody in the world knew how long the Defendant was going to be gone.

"I mean, folks, let's get real here. Isn't that the most absurd thing you ever heard in your life? This guy is going down the river on a big fed case. Now, for whatever reason he got acquitted.

"I don't know if he didn't do it or if they just screwed up the prosecution down there. You don't know that, either. But why in the world would they frame him on local charges when he is going down to Louisiana and Finnegan mark any evidence of he initially handled [sic].

"Look at it. Every bag is also marked by the Sheriff's Department. It has the Sheriff Department number on it. He helped his associates. My goodness, there is nothing wrong with that.

"And the little baggies that you didn't see, they are in there. Tim Duerr got them all out. Mr. Reichard dropped one right in front of you. The Court Reporter had to retrieve it later.

"There they are. Those bags are not just a couple of bread sacks stuffed with marijuana. I mean, there's an individual packages [sic] in there. My ancestor is not a famous American.

"I guess the prosecution isn't going to do well here, but the evidence is a lot more important than Mr. Reichard's ancestry or his agendas or his deceit. Just ask yourself. Why would we frame him?

"To get at this big case? No, that's ridiculous. If he had already had him, the evidence didn't go to Louisiana; so what's that got to do with it? Why would we frame him locally?

"There is no reason that's been advanced, no reason that's possible. How did we do it? John Finnegan sit [sic] out there on Hillgrove Fort Recovery all

weekend waiting for his chance to bust in and hide the stuff not even knowing how long he would have?

"Get real, again, folks. It didn't happen that way. Gee, and if he is going to frame him, why didn't he frame him bad? He used three times the bulk, 30.49 grams. That's not leaving much margin for error.

"He didn't even hit three times the bulk on marijuana. Why didn't he do it better if he was going to do it. Tell yourselves. The Defendant hasn't got a defense. It was like the old saying. Well, skip the old saying.

"We had people come in and testify for the Defendant. His friends, not all of his friends; some of his friends. He says why didn't we have the other people come in? Well, I have not had a steady stream of drug users and traffickers for the last month.

"Do you think they are really going to come in? Scott Thompson came in under subpoena because we had the photograph of him. How many other people were willing to come in and say yeah, I have been using drugs and dealing, so I know Mike Lyons.

"No, you don't expect them to come in here. My goodness, let's have some common sense. The whole thing is that friends deal with friends. Friends use with friends. Friends protect friends.

"So who is going to come in? Some friends. And are those friends going to say yeah or no? Either they don't know he is doing it or they are lying. Now, some of the friends may well not know he is doing it.

"They may be blinded. His parents probably don't know he is doing it. They are good people. They are here for the whole thing. We are not even here to attack the Defendant personally. He can be a nice guy. He can help his friends out; that's fine.

"That doesn't mean he's not a drug dealer. Loyalty is wonderful, but not when it includes your deception of people for your testimony. Ladies and gentlemen, you have evidence in front of you, and all of those exhibits—there's cocaine, marijuana, and methamphetamines that was found in various places throughout the house.

"It was found in the Defendant's brief case, with his personal papers. It was found under his couch. It was found in his registers. It was found in the bedroom that was shut off to everyone in the world but him.

"His only defense is that John Finnegan snuck in in the middle of the night to plant this stuff. There's nothing there to support that but Mr. Reichard's agenda of deceipt [*sic*].

"Is there any evidence or any common sense to support that? If not, then the other evidence is clear. It's there. It's hidden. It's got a lab there. It's got baggies. It's got twist ties. It's got stuff bagged up through the house. He's got the cash.

"Just look. He's got guns, just look; and he's got not [*sic*] other explanation for that. So if you use your common sense, you are going to return a verdict of guilty. Thank you."

The jury found Lyons not guilty of having a weapon under disability, but guilty of all the other counts. Judgment was entered, and Lyons was sentenced accordingly. From his conviction and sentence, Lyons appeals.

## II

Lyons's first assignment of error is as follows:

"The trial court erred as a matter of law in overruling defendant's motion to suppress evidence obtained pursuant to an illegal 'protective sweep' which was conducted as incident to an arrest warrant and subsequent warranted search."

At the outset of the hearing on Lyons's motion to suppress, the state conceded that the search warrant resulted from Detective Shellabarger's observations during a "sweep search." The sole issue is whether that "sweep search," or protective sweep, of the house at the time of Lyons's arrest violated the Fourth Amendment to the Constitution of the United States.

Both sides rely upon *Maryland v. Buie* (1990), 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276. In that case, the United States Supreme Court set forth the standard for a warrantless "protective sweep" of a residence in connection with a warranted arrest of an individual found at the residence. The court stated its holding as follows:

"We also hold that as an incident to the arrest, the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched. Beyond that, however, we hold that there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.*, 494 U.S. at 333, 110 S.Ct. at 1098, 108 L.Ed.2d at 285.

The Supreme Court noted the greater danger inherent in an in-home arrest:

"Moreover, unlike an encounter on the street or along a highway, an in-home arrest puts the officer at the disadvantage of being on his adversary's 'turf.' An

ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings." *Id.*

In *Maryland v. Buie,* police were arresting one of two men believed to have committed an armed robbery. The arrest was effected on the day of the robbery. The defendant emerged from the basement of the home. There was no particular reason to believe that anyone else was in the basement, but a police officer entered the basement "in case there was someone else down there." This officer noticed clothing having evidentiary value that was lying in plain view, and he seized it.

In *Buie, supra,* the Supreme Court did not determine whether the "protective sweep" in that case met the test articulated by the court, but remanded the case for a determination by the Maryland state courts.

Justice Stevens, concurring, felt obliged to comment that Maryland would have a formidable task on remand. Justice Stevens offered the following observation:

"Indeed, were the officers concerned about safety, one would expect them to do what Officer Rozar did before the arrest: guard the basement door to prevent surprise attacks. * * * As the court indicates, Officer Frolich might, at the time of the arrest, reasonably have 'looked in' the already open basement door * * * to ensure that no accomplice had followed Buie to the stairwell. But Officer Frolich did not merely 'look in' the basement; he entered it. That strategy is sensible if one wishes to search the basement. It is a surprising choice for an officer, worried about safety, who need not risk entering the stairwell at all." *Maryland v. Buie, supra,* 494 U.S. at 338, 110 S.Ct. at 1100, 108 L.Ed.2d at 288.

Justice Stevens's comment in his footnote 2 is also interesting:

"What more the officers might have done to protect themselves against threats from other places is obviously a question not presented on the facts of this case, and so is not one we can answer. Indeed, the peculiarity of Officer Frolich's search is that it appears to have concentrated upon the part of the house least likely to make the departing officers vulnerable to attack." *Id.* at 338, 110 S.Ct. at 1100, 108 L.Ed.2d at 288.

Significantly, in the case before us the officers were concerned about the possibility of being fired upon from an upstairs window while walking from the house back to the road, which offered little cover. This would seem to present a greater danger than the risk of being attacked by someone in a basement.

In *Maryland v. Buie, supra,* Justice Kennedy, concurring, offered his observation contrary to that of Justice Stevens:

"Based on my present understanding of the record, I should think the officers' conduct here was in full accord with standard police safety procedure, and that

the officers would have been remiss if they had not taken those precautions." *Id.* at 339, 110 S.Ct. at 1101, 108 L.Ed.2d at 289.

As we understand the holding in *Maryland v. Buie,* the applicable test is whether the officers effecting the arrest have a reasonable belief, based upon articulable facts and rational inferences from those facts, that the area to be swept harbors an individual posing a danger to them. The scope of the protective sweep must not exceed that reasonably necessary to protect the safety of the officers.

In the case before us, there were a number of facts articulated by the officers that, together with rational inferences taken from those facts, would warrant a reasonably prudent police officer in believing that a danger was posed by the risk of an armed attack by some person or persons in the house. These facts and inferences included the observation, by a number of the officers, that there was debris on the first floor suggesting that a party had taken place the night before, and that the couch on the first floor appeared to have been slept in overnight; the presence of several firearms, including a handgun, lying in plain view on the first floor; Lyons's failure at any time to respond to urgent and persistent questioning about the existence of other persons in his home; the fact that the charge for which Lyons was being arrested involved a scheme to distribute approximately 285,000 pounds of marijuana; the fact that weapons are often present at major distribution centers for illegal drugs to protect the drugs and the money to be found there; the fact that the officers could not see in the windows on either the first or second floors; the fact that one of the people allegedly involved in the criminal activity was "in this area" and unaccounted for; the fact that the house was well back from the road and that there was little, if any, cover or concealment between the house and the road; and the fact that a group of persons associated with Lyons had a reputation for being very violent.

Based upon all of these facts, we conclude that a prudent police officer would have had a reasonable belief that he was exposed to a risk of harm from some person or persons hiding in the house.

Finally, the protective sweep in this case appears to have been limited in scope to a quick search of those places in the house where someone might be hiding, to make sure that there was no danger. The sweep appears to have lasted not more than five or six minutes at the most, and was not a full-blown search for evidence conducted in the guise of a protective sweep.

Lyons's first assignment of error is overruled.

### III

Lyons's second assignment of error is as follows:

"The trial court erred in not granting a mistrial in instances wherein the prosecuting attorney in the presence of the jury and during closing argument charged defense counsel with deceit, referred to evidence which had not been admitted, and referred to a witness who did not testify."

Only one of the matters covered in this assignment of error was objected to during the trial. This appears to have been a reference to the fact that Lyons had an expert who did not testify concerning whether the alleged narcotics found in his house were in fact illegal substances. This amounted to nothing more than a fleeting reference to an unnamed expert. Essentially, the state was making the legitimate point that there was no witness to challenge its expert's testimony that the alleged narcotics were, in fact, narcotics. That is fair comment, and we conclude that the objection was properly overruled.

Although it is not referred to in the text of his argument, Lyons may have been alluding in this assignment of error to an incident in which the prosecutor referred to a documentary exhibit that had not been admitted. This appears to have been inadvertent, the result of the prosecutor's having looked at the wrong stack of documents at his table, and was cleared up immediately after objection by Lyons. We find no prejudicial error here.

All of the other matters referred to under this assignment of error were not objected to during trial. Therefore, they are governed by the plain error standard. Only the most egregious error is cognizable under the plain error standard, and the issue involving prosecutorial misconduct has been described as whether, but for the prosecutor's misconduct, the verdict would have been otherwise. *State v. Johnson* (1989), 46 Ohio St.3d 96, 102, 545 N.E.2d 636, 642.

In the case before us, Lyons had impugned the integrity of FBI Special Agent John Finnegan, the person who directed the arrest. Lyons contended that Finnegan planted evidence in his house to frame him.

In rebuttal, the prosecutor alleged that the only "agenda" was deceit on the part of the defense. There were, at most, three brief references to deceit on the part of the defense. While we agree with Lyons that the prosecutor ought to have been more careful in avoiding any implication impugning the integrity of Lyons's trial counsel, we cannot find that these brief references so charged the atmosphere of the trial that the jury was likely to have been misled. Lyons had alleged nefarious corruption on the part of Special Agent Finnegan. The thrust of the state's response was that this was an outrageous accusation, totally unsupported by any evidence in the case. In that context, the references to

"deceit" on the part of the defense, while not excusable, are understandable. In any event, it appears unlikely that this had any impact on the jury's deliberation.

Lyons's second assignment of error is overruled.

## IV

Both of Lyons's assignments of error having been overruled, the judgment of the trial court is affirmed.

*Judgment affirmed.*

BROGAN and WOLFF, JJ., concur.