[Cite as *State v. Byrd*, 2017-Ohio-6903.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| *Plaintiff-Appellee* | : | Appellate Case No. 27340 |
| | : | |
| v. | : | Trial Court Case No. 2015-CR-3976 |
| | : | |
| LAQUITTA T. BYRD | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| *Defendant-Appellant* | : | |
| | : | |

. . . . . . . . . .

O P I N I O N

Rendered on the 21st day of July, 2017.

. . . . . . . . . .

MATHIAS H. HECK, JR., by MICHAEL J. SCARPELLI, Atty. Reg. No. 0093662, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

KATHERINE ROSS-KINZIE, Atty. Reg. No. 009762, Assistant State Public Defender, 250 East Broad Street, Suite 1400, Columbus, Ohio 43215
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, J.

**{¶ 1}** Defendant-appellant, LaQuitta T. Byrd, appeals from her conviction and sentence, following a bench trial, on one count of possession of cocaine, one count of possession of heroin, and one count of illegal conveyance of drugs onto the grounds of a detention facility. Byrd contends that the trial court erred in overruling her motion to suppress evidence obtained as a result of a warrantless search of her residence. For the reasons outlined below, the judgment of the trial court will be reversed and the cause remanded for further proceedings consistent with this Opinion.

**Facts and Course of Proceedings**

**{¶ 2}** On the morning of December 23, 2015, members of the Dayton Police Department sought to execute an arrest warrant on Andrew Nason. Using a cellular phone number that was known to be associated with Nason, the police were able to determine that Nason's phone was located inside the residence at 1641 South Smithville Road in Dayton. Dayton police officers surrounded the home. Two vehicles were in the driveway of the residence. The police officers connected both vehicles to Julie Custer, the mother of two of Nason's children.

**{¶ 3}** The police officers began knocking on the doors and windows of the residence. During the forty-five minutes that the police had the residence surrounded, the police made several announcements over a loud speaker system, instructing any occupants of the house to exit the house and alerting any occupants that the police had an arrest warrant for Nason. While the house was surrounded, two of the officers in the back of the house saw Nason attempting to escape through a rear window of the home.

After seeing the officers, Nason retreated back into the home.

{¶ 4} A canine police unit arrived at the house. The police announced over the loud speaker system that the officers were prepared to forcibly enter the residence and deploy the canine to apprehend Nason. Following this announcement, Nason opened the front door of the house and surrendered. Officers secured Nason in handcuffs outside of the house.

{¶ 5} After Nason was secured outside the residence, two officers entered the residence and began a search of the house. Detective Stutz proceeded up the stairs of the house and encountered Byrd at the top of the stairs. Byrd was dressed and appeared alert. Detective Stutz and Detective Cope escorted Byrd to a police cruiser. In response to questions, Byrd stated that she lived at the residence and that she did not exit the house while it was surrounded because she was afraid of the police, not Nason. Byrd was placed under arrest and taken to the Montgomery County Jail. During a search of Byrd at the jail, police discovered heroin and crack cocaine hidden in Byrd's groin area.

{¶ 6} On December 31, 2015, the Montgomery County Grand Jury indicted Byrd on one count of possession of cocaine (twenty-seven grams but less than one hundred grams), a felony of the first degree in violation of R.C. 2925.11(A), one count of possession of heroin (one gram but less than five grams), a felony of the fourth degree in violation of R.C. 2925.11(A); one count of tampering with evidence, a felony of the third degree in violation of R.C. 2921.12(A)(1); one count of illegal conveyance of drugs of abuse onto the grounds of a detention facility, a felony of the third degree in violation of R.C. 2921.36(A)(2); one count of obstructing official business, a misdemeanor of the second degree in violation of R.C. 2921.31(A); and one count of obstructing justice, a

felony of the third degree in violation of R.C. 2921.32(A)(1).   Dkt. 1.

{¶ 7} On January 19, 2016, Byrd filed a motion to suppress.   Following a hearing, the trial court overruled the motion.   Dkt. 21.   Byrd subsequently waived her right to a jury trial.   Dkt. 32.   The State dismissed the one count of obstructing official business. Following a bench trial, the trial court found Byrd guilty as charged on the cocaine possession, heroin possession, and illegal conveyance counts in the indictment and not guilty on the tampering with evidence and obstructing justice counts.   Dkt. 46.

{¶ 8} On October 5, 2016, the trial court sentenced Byrd to three years in prison for cocaine possession, one year in prison for heroin possession, and one year in prison for illegal conveyance, all to be served concurrently with each other.   Dkt. 52.   The trial court stayed execution of Byrd's sentence pending appeal.   Byrd now appeals from her conviction and sentence.

**First Assignment of Error**

{¶ 9} Byrd's First Assignment of Error is as follows:

THE TRIAL COURT ERRED IN OVERRULING LAQUITTA BYRD'S MOTION TO SUPPRESS, IN VIOLATION OF THE FOURTH AMENDMENT TO THE UNITED STATES CONSTITUTION, AND ARTICLE 1, SECTION 14, OF THE OHIO CONSTITUTION.

{¶ 10} Byrd contends that the trial court erred in overruling her motion to suppress based on a finding that the police officers discovered her during a permissible protective sweep of the inside of the residence.   According to Byrd, "the necessary arrest [of Nason] was already made outside the residence and no circumstances justified a protective

sweep." Byrd Appellate Brief, p. 8.

{¶ 11} "Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." (Citation omitted.) *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. "Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." (Citation omitted.) *Id.* "Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." (Citation omitted.) *Id.*

{¶ 12} It is undisputed that Byrd was arrested as a direct result of a warrantless search of her residence. "The Fourth Amendment to the United States Constitution and Section 14, Article I of the Ohio Constitution guarantee that 'the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated * * *.' " *State v. Retherford*, 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994). "These provisions grant to the citizens of Ohio what is among our most cherished of constitutional rights." *Id.* "[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment was directed." (Citation omitted.) *Payton v. New York*, 445 U.S. 573, 585, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable. *Id.* at 586.

{¶ 13} Exigent circumstances are a well-established exception to the Fourth Amendment's warrant requirement. *State v. Berry*, 167 Ohio App.3d 206, 2006-Ohio-

3035, 854 N.E.2d 558, ¶ 12 (2d Dist.). The State has the burden of showing the validity of a warrantless search. *State v. Hilton*, 2d Dist. Champaign No. 08-CA-18, 2009-Ohio-5744, ¶ 21-22, citing *Xenia v. Wallace*, 37 Ohio St.3d 216, 218, 524 N.E.2d 889 (1988). The exigent or emergency circumstances exception to the warrant requirement applies in a variety of situations, including when entry into a building is necessary to protect or preserve life, to prevent physical harm to persons or property, or to prevent the concealment or destruction of evidence, or when officers are in "hot pursuit" of a fleeing suspect or someone inside poses a danger to the police officer's safety. *E.g., State v. Sharpe*, 174 Ohio App.3d 498, 2008-Ohio-267, 882 N.E.2d 960, ¶ 48 (2d Dist.); *Kentucky v. King*, 563 U.S. 452, 460, 131 S.Ct. 1849, 179 L.Ed.2d 865 (2011). "In order to justify an exception to the warrant requirement, the costs involved in obtaining a warrant must be sufficiently significant to justify avoiding the delay inherent in procuring a warrant." *Sharpe* at ¶ 29.

{¶ 14} The State contends that the discovery of Byrd in her residence was the product of a permissible protective sweep conducted by the police officers. A protective sweep is a reasonable exception to the Fourth Amendment's warrant requirement as a corollary of the exigent or emergency circumstances exception. *State v. McLemore*, 197 Ohio App.3d 726, 2012-Ohio-521, 968 N.E.2d 612, ¶ 9 (2d Dist.); *State v. Mathews*, 2d Dist. Montgomery No. 26326, 2015-Ohio-1047, ¶ 10, citing *Maryland v. Buie*, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990).

{¶ 15} "A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding."

*Buie* at 327.   In *Buie*, the United States Supreme Court provided the following reasoning for allowing police officers to conduct warrantless, protective sweeps after an arrest has been made:

> In [*Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968),] and [*Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983),] we were concerned with the immediate interest of the police officers in taking steps to assure themselves that the persons with whom they were dealing were not armed with, or able to gain immediate control of, a weapon that could unexpectedly and fatally be used against them.   In the instant case, there is an analogous interest of the officers in taking steps to assure themselves that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack.   The risk of danger in the context of an arrest in the home is as great as, if not greater than, it is in an on-the-street or roadside investigatory encounter.   A *Terry* or *Long* frisk occurs before a police-citizen confrontation has escalated to the point of arrest.   A protective sweep, in contrast, occurs as an adjunct to the serious step of taking a person into custody for the purpose of prosecuting him for a crime. Moreover, unlike an encounter on the street or along a highway, an in-home arrest puts the officer at the disadvantage of being on his adversary's "turf." An ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings.

*Buie* at 332-333.

**{¶ 16}** With that in mind, the *Buie* Court held:

> [T]hat as an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched. Beyond that, however, we hold that there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.

*Buie,* 494 U.S. at 334, 110 S.Ct. 1093, 108 L.Ed.2d 276.

**{¶ 17}** The *Buie* holding also includes a subjective requirement, as the court further held that:

> The Fourth Amendment permits a properly limited protective sweep in conjunction with an in-home arrest when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene.

*Id.* at 337. *See also* Messing*, The Protective Sweep Doctrine: Reaffirming a Limited Exception,* 44 Colum. J.L. & Soc. Probs. 33 (2010) ("Unlike the standard in [*Terry*], the [*Buie*] standard has both an objective and subjective requirement. The government not only must meet the burden of showing a reasonable belief that a third party is present but also must satisfy the subjective requirement that the searching officer actually possessed that belief. The [*Buie*] test therefore requires a reasonable suspicion that another person (1) is present and (2) poses a danger.").

{¶ 18} In *State v. Lyons*, 83 Ohio App.3d 525, 615 N.E.2d 310 (2d Dist.1992), we summarized the *Buie* test relating to warrantless, protective sweeps conducted after an arrest:

> As we understand the holding in *Maryland v. Buie*, the applicable test is whether the officers effecting the arrest have a reasonable belief, based upon articulable facts and rational inferences from those facts, that the area to be swept harbors an individual posing a danger to them. The scope of the protective sweep must not exceed that reasonably necessary to protect the safety of the officers.

*Id.* at 534.

{¶ 19} In *State v. Sharpe*, 174 Ohio App.3d 498, 2008-Ohio-267, 882 N.E.2d 960 (2d Dist.), we provided further guidance on the limits of the protective-sweep exception:

> The protective-sweep exception to the warrant requirement in *Buie* and *Lyons* requires some positive indication that another person or persons remain in the residential premises where a subject is arrested and that they pose a threat to the safety of officers or others. Lacking that indication, there is not a need to act sufficient to avoid the requirement of a prior warrant if the house is to be searched after a defendant's arrest there. Mere suspicion that a weapon remains inside is insufficient. Likewise, not knowing whether anyone else is there is an insufficient pretext because the need for protection necessarily implies that another person or persons are there. Faced with such doubts, and absent any reason to believe that other persons may be inside, officers must obtain a warrant before they conduct

a search of a defendant's house after a defendant's arrest there.

*Id.* at ¶ 46.

{¶ 20} In *Sharpe*, we found that the police officers did not have a reasonable belief, based upon articulable facts and rational inferences from those facts, that the area to be swept harbors an individual posing a danger to them.   We explained that:

> After Sharpe was arrested, his prior threat of suicide presented no basis to search for a gun he could have used for that purpose, but didn't. The only other person involved in the alleged domestic-violence offense, Stephanie McConnaghey, the alleged victim, had been safe outside the house with police during the previous two to three hours they were there. Police saw no one else go in or come out of the house during that time. The record does not reflect that any shots, calls for help, or other disturbances were heard from inside the house during those several hours. Sharpe's arrest when he emerged from the house was calm and uneventful. The state suggests that Sharpe's prior unorthodox method of entry, through a rear window, supports a suspicion that someone else was inside the house and possibly had been injured.   That is speculative.

*Id.* at ¶ 54.

{¶ 21} Similarly, in *McLemore*, 197 Ohio App.3d 726, 2012-Ohio-521, 968 N.E.2d 612, we held that once a defendant came out of the residence "and was taken into custody by police, there was no suggestion either that another person or persons remained inside that residence or that the person posed a threat to the safety of the officers or others." *Id.* at ¶ 11.   In *McLemore*, nearly two hours passed between the victim's initial call to

police and the officers' arrival at the residence in question. Because of this, the State argued that the police had no idea who might have entered the residence during that time. We noted that "[n]ot knowing whether anyone else was inside the residence is an insufficient pretext for a protective sweep to learn whether anyone is, in fact, inside." *Id.* at ¶ 13, citing S*harpe*. We also rejected the argument that the warrantless search was permissible to determine if anyone was inside who needed aid. We held:

> Police had no reasonable basis to suspect that anyone in need of their aid was inside the residence after defendant came outside and was arrested by police. Police knew that the sole victim was not at that location and was safe. That they did not know whether anyone else was inside is insufficient to justify their entry. *Sharpe.* Their concern that another person might be inside who needed aid is wholly speculative on these facts and presented no emergency justifying their warrantless entry into the residence. *Id.* For the same reasons we concluded that the protective-sweep exception has not been established in this case, neither has the exigent- or emergency-circumstances exception been established. The warrantless protective-sweep search of this residence by police violated defendant's Fourth Amendment rights.

*McLemore* at ¶ 16.

{¶ 22} In *State v. Spradlin*, 187 Ohio App.3d 767, 2010-Ohio-2140, 933 N.E.2d 1131 (2d Dist.), we distinguished our decision in *Sharpe* and affirmed the trial court's determination that the officers had a reasonable and articulable suspicion that other persons remained in the apartment who could pose a risk to the police officers. We

stated:

> McDaniel was wanted for felonious assault with a deadly weapon in connection with a shooting that left a man paralyzed. While repeatedly knocking on the door of Spradlin's apartment for 25 minutes, Donley stated that he heard "scurrying around and moving around, things moving around inside the door," and "people within the house," and "conversations, whispering." Upon entering the apartment and finding McDaniel, the officers also encountered Spradlin and Jones, who was walking around in the rear of the apartment. At that time, they were unable to view the entirety of the apartment, including the kitchen, bedrooms and bathroom, and given the noises they had heard prior to entry, they had reason to believe that other persons could be inside. The fact that the officers had legitimate reason to believe that other persons were present in the apartment, a fact confirmed by the presence of Jones and Spradlin, is significant and distinguishes this case from *Sharpe*. Importantly, the officers expressed concern for their safety.

> On this record, we agree with the trial court that the officers had a reasonable and articulable suspicion that following McDaniel's arrest, other persons besides Spradlin and Jones, who could pose a risk to the safety of the officers, remained inside the apartment.

*Spradlin* at ¶ 34-35.

{¶ 23} In overruling Byrd's motion to suppress relating to the warrantless entry into her residence, the trial court found (Dkt. 21, p. 6):

The protective sweep conducted in this case falls, it seems to this writer, somewhere between *State v. Sharpe* and *State v. Spradlin*, [187 Ohio App.3d 767, 2010-Ohio-2140, 933 N.E.2d 1131 (2d Dist.)], but, in the end, it is concluded that Detective Stutz and the other officers had, using the Second District's language, a reasonable and articulable suspicion that other persons were in the home and that these persons could pose a danger to the officers or could need assistance. The officers knew Nason did not live at 1641 S. Smithville Road, and, further, the officers did not know what, if any, connection Nason had to the home. This circumstance suggested the significant possibility that the individuals who lived at the home were present. Additionally, two vehicles connected to Nason were parked in the home's driveway with the presence of a second vehicle increasing the possibility of individuals other than Nason being in the home. It is concluded, based upon these factors, that Detective Stutz and the other officers had a legitimate, articulable suspicion that Nason was not alone in the home, and that, since there was no response to the repeated knocks on the door and commands to exit, that such individuals could pose a danger to the officers or others or, perhaps, needed assistance. It is, accordingly, concluded that the police entry into 1641 S. Smithville Road did not violate the 4th Amendment.

{¶ 24} In reviewing the trial court's ruling on Byrd's motion to suppress, we must keep in mind that the State has the burden of showing the validity of a warrantless search. In attempting to meet its burden, the State offered the testimony of three officers who

were present at the scene when Nason and Byrd were arrested.  Sergeant Daniel A. Williger, a patrol sergeant with the Dayton City Police Department, testified that when he arrived on the scene at 1641 South Smithville Road, there were already four or five police officers at the residence.  Transcript of the February 10, 2016 Motion to Suppress Hearing, p. 8-9.  Sergeant Williger announced the following several times over his cruiser's PA system during a twenty-minute period:  "Andrew Nason, this is the Dayton Police Department, there is a warrant for your arrest, we are giving you orders to come out of the house, showing empty hands.  You need to do so immediately."  *Id.* at 9.  At one point while the house was surrounded, two uniformed officers at the back of the house saw Nason attempting to escape through a rear window.  *Id.*  Upon seeing the officers, Nason retreated back into the house and continued to ignore verbal commands from the police to come out and give himself up.  *Id.*  Once the K-9 officer arrived at the scene, Sergeant Williger gave one final command over the PA system announcing that the police were going to force entry into the residence and send in a K-9 to assist in getting Nason out of the house.  *Id.* at 12.  As soon as Sergeant Williger completed this final announcement, "the front door of the residence came open very quickly.  Mr. Nason did in fact, lay down on the ground.  He complied with all commands and was handcuffed without any further incident."  *Id.*

{¶ 25} According to Sergeant Williger, once Nason was handcuffed:

Mr. Nason was removed from the house and secured in the vehicle and in order to be able to say that the house was clear in its entirety, as we have no knowledge whether there may be persons either hurt within the house or being held against their will.  Detectives went in the house to clear

the house to ensure that there was nobody who was in any state of duress. *Id.* at 12. From the time that Sergeant Williger arrived at the scene until the time Byrd was arrested, Sergeant Williger had no knowledge of who owned the residence and who resided there. *Id.* at 20-21.

{¶ 26} Officer Thomas Cope, a homicide investigator for the Dayton Police Department, also testified regarding the events leading up to the arrest of Byrd. *Id.* at 24-25. Upon arrival at the scene, Officer Cope discovered that there were two cars parked in the driveway that were registered to Julie Custer, who is the mother of a couple of Nason's children. *Id.* at 27. This information made Officer Cope "very certain" that Nason was inside the residence. *Id.* at 28. After several police officers surrounded the residence, Officer Cope knocked on the door numerous times, announcing the presence of the Dayton Police Department and advising of an arrest warrant for Nason and requesting all occupants to come out of the house. *Id.* at 29-30. Officer Cope received information from another officer that Nason was spotted attempting to come out through a window in the back of the house. *Id.* at 30. Officer Cope was not aware if anyone else was in the house other than Nason. *Id.* at 31.

{¶ 27} Officer Cope testified that after Nason exited the house:

I placed him in - - well, we ordered him to the ground, we - - he was - - ordered his hands behind his back. He was not immediately compliant, so we had to put his hands behind his back. We put him in handcuffs and then walked him to a cruiser. I believe - - actually, I believe it was a uniformed officer that walked him to the cruiser, then I cleared the first floor of the house, while other officers went and cleared the second floor of the

house.

Id. at 32.

{¶ 28} Officer Cope further testified that he did not attempt to get a search warrant after pings to Nason's phone showed the presence of Nason's phone at 1641 South Smithville Road or after Nason was spotted attempting to come out of the back of the residence. *Id.* at 44-45. Officer Cope did not see any evidence of any activity going on inside the house prior to Nason's exit from the house. *Id.* at 47. Officer Cope gave the following explanation of why he entered the residence and cleared the first floor after Nason was taken to the police cruiser in handcuffs:

> No, I was just making sure he didn't have any hostages or anything like that in there. Because after a prolonged standoff like that, you never know what's in there. So, for our safety since we might be there for a while and also the safety of anyone else who might be in there, we do what we call protective sweep of the house, just checking broad areas where people might be. We don't open anything, we don't look in anywhere. We just look for places where people might be hiding or stashed out.

*Id.* at 46.

{¶ 29} Detective Ginger Stutz with the Dayton Police Department also testified at the suppression hearing. She worked with Officer Cope in the attempt to arrest Nason. Detective Stutz gave Nason's phone number to Officer Cope so that he could ping it to determine the location of the phone. *Id.* at 50-51. When Detective Stutz arrived at 1641 South Smithville Road, she recognized a red car parked in the driveway as one that belonged to Julie Custer, who was Nason's girlfriend and mother of two of his children.

*Id.* at 51-52. Detective Stutz did not make any effort to determine who lived at 1641 South Smithville and did not run the plate on the car parked in the driveway. *Id.* at 52-53. The location of Nason's cell phone at that address along with the presence of a car that matched the description of a car belonging to Nason's girlfriend was enough to convince Detective Stutz that Nason was inside the residence. *Id.* at 54. Detective Stutz knocked on windows and on the side door as announcements were made by other police officers. *Id.* at 54.

**{¶ 30}** Detective Stutz testified as follows regarding how she proceeded after Nason was arrested:

> While [Nason] was laying on the ground, Detective Cope and Detective Daugherty were bringing his hands behind his back, they were getting ready to do that. We didn't have anybody else in the house at that point, any officers. So I stepped over Andrew Nason and went into the house, so that way I could have Detective Daugherty and Detective Cope's back in case there were anybody - - was anybody else in the house.
>
> * * *
>
> I remained stationed at that point in the living room, I believe, right in front of the door until Andrew Nason was picked up off the ground and escorted out. At that point, another - - a uniformed crew came in and he and I began walking up the steps.

*Id.* at 55. Detective Stutz did not know anyone else was in the home other than Nason until she discovered Byrd during the protective sweep. *Id.* at 70.

**{¶ 31}** The common thread across the testimony of the three police officers is that

none of them were aware of the presence of any other individuals in the house other than Nason. At the time of the warrantless entry, none of the officers knew who resided at 1641 South Smithville. In fact, the State stipulated at the suppression hearing that at the time of the arrest of Nason, the Dayton Police had no idea that Byrd was living at 1641 South Smithville Road. *Id.* at 41-42. Further, none of the officers heard any activity or sounds coming from inside of the house while the house was surrounded and did not see anyone enter or leave the house other than when Nason attempted to escape out a window in the back of the house. The facts before us are consistent with the facts in *Sharpe* and *McLemore* where there was lacking any facts that would permit the officers to form a reasonable and articulable belief that other persons were in the home and that these persons posed a danger to the officers or needed assistance.

{¶ 32} The trial court relied heavily on the fact that there were two cars in the driveway and that the officers were not aware of any connection between Nason and the house to infer that there was a "significant possibility that the individuals who lived at the home were present." Dkt. 21, p. 6. But this finding is inconsistent with the testimony of the police officers, as none of the officers testified that the two cars led them to believe there were other individuals inside the house. In fact, the officers testified that they were not aware of anyone being inside the house with Nason and that they did not see or hear any activity inside the house. Accordingly, their testimony is consistent with conducting a protective sweep as a matter of course rather than doing so due to any heightened safety concerns derived from particular observations or information the officers obtained after arriving at 1641 South Smithville Road. "Clearly, *Buie* requires more than ignorance or a constant assumption that more than one person is present in a residence."

*United States v. Archibald*, 589 F.3d 289, 300 (6th Cir.2009). "In fact, allowing the police to conduct protective sweeps whenever they do not know whether anyone else is inside a home creates an incentive for the police to stay ignorant as to whether or not anyone else is inside a house in order to conduct a protective sweep." *Id.* Further, "an overly generous application of the 'protective sweep' exception could swallow the presumptive rule against warrantless searches of houses." *United States v. Barone*, 721 F. Supp.2d 261, 275 (S.D.N.Y.2010).

**{¶ 33}** We conclude that, under the particular facts before us, the warrantless, protective-sweep search of Byrd's residence by Dayton police officers violated Byrd's Fourth Amendment rights. Therefore, the trial court erred in overruling Byrd's motion to suppress.

**{¶ 34}** Byrd's first assignment of error is sustained.[1]

### Second Assignment of Error

**{¶ 35}** Byrd's second assignment of error states:

THE TRIAL COURT ERRED WHEN IT CONVICTED AND SENTENCED LAQUITTA BYRD TO AN ENHANCED LEVEL OF POSSESSION IN COCAINE BASED ON A GROSS WEIGHT THAT INCLUDED FILLER MATERIAL. *STATE V. GONZALES*, SLIP OPINION NO. 2016-OHIO-8319.

---

[1] In this assignment of error, Byrd also contends that the trial court erred in failing to grant her motion to suppress on the alternative basis that police officers lacked probable cause to arrest her. Given our conclusion that the warrantless, protective-sweep search of her residence by Dayton police officers violated Byrd's Fourth Amendment rights, we need not address Byrd's probable cause argument.

{¶ 36} Based on our disposition of the first assignment of error, Byrd's second assignment of error is overruled as moot.   App.R. 12(A)(1)(c).

## Conclusion

{¶ 37} Having sustained Byrd's first assignment of error, the judgment of the trial court is reversed and the cause is remanded for further proceedings consistent with this Opinion.

. . . . . . . . . . . . .

DONOVAN, J. and FROELICH, J., concur.

Copies mailed to:

Mathias H. Heck, Jr.
Michael J. Scarpelli
Katherine Ross-Kinzie
Hon. Erik R. Blaine